503 F.2d 930
 Dorothy GAUTREAUX et al., Plaintiffs-Appellants,
v.
CHICAGO HOUSING AUTHORITY and James T. Lynn, Successor to
George W. Romney, Secretary of the Department of
Housing and Urban Development, et al.,
Defendants-Appellees.
 Nos. 74-1048, 74-1049.
 United States Court of Appeals, Seventh Circuit.
 Argued June 4, 1974.
Decided Aug. 26, 1974, Rehearing Denied Sept. 30, 1974.
 
 Alexander Polikoff, Milton I. Shadur, Patrick W. O'Brien and Watson B. Tucker, Chicago, Ill., for Chicago Housing.
 Carla A. Hills, Asst. Atty. Gen., Anthony J. Steinmeyer, Atty. Dept. of Justice, Washington D.C., James R. Thompson, U.S. Atty., Gary L. Starkman, Asst. U.S. Atty., Chicago, Ill., for Dorothy Gautreaux.
 Before CLARK, Associate Justice,[1] and CUMMINGS and TONE, Circuit judges.
 Mr. Justice CLARK:
 
 
 1
 Appellants, black tenants in and applicants for public housing, brought these consolidated cases separately in 1966 against the Chicago Housing Authority (CHA) and the Secretary of Housing and Urban Development (HUD) respectively, charging that CHA had intentionally violated 42 U.S.C. 1981 and 1982 in maintaining existing patterns of residential separation of races by its tenant assignment and site selection procedures, contrary to the Equal Protection Clause of the Fourteenth Amendment; and that HUD had 'assisted in the carrying on . . . of a racially discriminatory public housing system within the City of Chicago' in violation of the Fifth Amendment. Appellants sought an injunction against CHA restraining such practices and requiring CHA to remedy the past effects of its unconstitutional site-selection and tenant-assignment procedures by building any future public housing units in predominantly white areas. This appeal grows out of the decision of the district court on remand for a determination of appropriate relief pursuant to separate findings that both CHA and HUD were responsible for de jure segregation in the public housing program in Chicago. In 1969 the District Court found with the appellants on the merits and since that time has devoted its efforts to effectuating this ruling. After some four years of hearings, several judgment orders and four appeals, the District Court on the last remand called on the parties to propose a 'comprehensive plan' to remedy past effects of the public housing segregation indulged in by CHA and HUD, including 'alternatives which are not confined in their scope to the geographic boundary of the City of Chicago.' HUD proposed, and the District Court, after an evidentiary hearing, ordered a plan under which HUD would 'cooperate' with CHA in the latter's efforts to increase the supply of public housing units but eliminated any relief not confined to the geographic boundary of the City of Chicago and refused to impose any specific affirmative obligations upon HUD beyond its 'best efforts'. 363 F.Supp. 690 (1973). The appellants contend that a metropolitan area remedial plan including housing in suburban areas, as well as those within the limits of Chicago, is necessary to remedy the past effects of said unconstitutional public housing segregation policy and attain that racial balance required by the Fourteenth Amendment. Given the eight year tortuous course of these cases, together with the findings and judgment orders of the District Court and the opinions of this Court (now numbering five), we believe the relief granted is not only much too little but also much too late in the proceedings. In effect, appellants, having won the battle back in 1969, have now lost the war. We are fully aware of the many difficult and sensitive problems that the cases have presented to the able District Judge and we applaud the care, meticulous attention and the judicious manner in which he has approached them. With his orders being ignored and frustrated as they were, he kept his cool and courageously called the hand of the recalcitrant. Perhaps in the opinion on remand on the third appeal, 457 F.2d 124 (7th Cir. 1972), the repetition of a statement in the opinion on remand in the second appeal, 448 F.2d 731 that: 'It may well be that the District Judge, in his wise discretion, will conclude that little equitable relief above the entry of a declaratory judgment and a simple 'best efforts' clause, will be necessary . . .' led the beleaguered District Judge to limit any plan to the boundaries of the City of Chicago and the 'best efforts' of CHA and HUD. This is to be regretted and we trust that upon remand the matter will be expedited to the end that the segregated public housing system which has resultedfrom the action of CHA and HUD will be disestablished, and the deficiency in the supply of dwelling units will be corrected as rapidly as possible and in the manner indicated in this opinion.
 
 
 2
 We shall not burden this opinion with the details[2] of the eight-year delay that has thus far deprived the appellants of the fruits of the District Court's judgment entered on July 1, 1969. In addition the unconstitutional action of CHA has stripped thousands of residents of the City of Chicago of their Fifth and Fourteenth Amendment rights for a score of years. Indeed, anyone reading the various opinions of the District Court and of this Court quickly discovers a callousness on the part of the appellees towards the rights of the black, underprivileged citizens of Chicago that is beyond comprehension. As far back as 1954, the District Court found that CHA had continuously refused to permit black families to reside in four public housing projects built before 1944; and that as far back as 1954 CHA has imposed a black quota on the four projects to the end that at the beginning of 1968 black tenants only occupied between 1 percent to 7 percent of the 1,654 units in the projects. The non-white population of Chicago at that time was 34.4 percent. In 64 public housing sites, having 30,848 units (other than the four above mentioned), the tenants were 99 percent black. All during this period Illinois law required that CHA secure prior approval of new sites for public housing from the City Council of the City of Chicago, but the District Court found that CHA set up a preclearance arrangement under which the alderman in whose ward a site was proposed would receive an informal request from CHA for clearance. The alderman, the Court found, to whom sites in the white neighborhoods were submitted, vetoed the sites and the City Council rejected 99 1/2 percent of the units proposed for white sites while only 10 percent were refused in black areas. Moreover, the Court found that during this period about 90 percent of the waiting list of some 13,000 applicants to CHA for occupancy in its projects were black. These findings were neither challenged nor appealed. Furthermore, as early as July 1, 1969, a judgment order was entered herein, requiring CHA to build 700 new housing units in predominantly white areas and requiring 75 percent of all future units built by CHA to be constructed in such areas. This judgment also ran against the City Council of the City of Chicago (not then a party) on the basis of notice. Finally, CHA was directed by the District Court to 'affirmatively administer its public housing system . . . to the end of disestablishing the segregated public housing system which has resulted from CHA's unconstitutional site selection and tenant assignment procedures . . . (and) use its best efforts to increase the supply of Dwelling Units as rapidly as possible . . .'. 304 F.Supp. 736 (1969). No appeal was taken from this judgment.
 
 
 3
 Appellants and the District Court waited patiently for a year and a half but CHA submitted no sites for family dwellings to the City Council. The appellants contacted CHA and were advised that CHA had no intention to submit sites prior to the Chicago mayoralty election of April, 1971. The parties then asked for and were given informal hearings, so as to prevent publicity, and finally the District Court modified its 'best efforts' provision in the July 1, 1969 judgment order so as to affirmatively require CHA to submit sites for no fewer than 1500 units to the City Council for approval on or before September 20, 1970. This order was appealed by CHA and affirmed, 436 F.2d 306, cert. den. 402 U.S. 922, 91 S.Ct. 1378, 28 L.Ed.2d 661 (1971).
 
 
 4
 Meanwhile, in the separate suit against HUD filed simultaneously with the one against CHA (and now consolidated), the District Court had dismissed all four counts. On appeal this Court held that HUD had violated the due process clause of the Fifth Amendment and reversed with directions to enter a summary judgment for the appellants. This Court found that HUD had approved and funded family housing sites chosen by CHA in black areas of Chicago. HUD's explanation was 'it was better to fund a segregated housing system' than deny housing altogether. This Court found that in the sixteen years (1950-1966) HUD spent nearly $350 million on such projects 'in a manner which perpetuated a racially discriminatory housing system in Chicago'; that its excuse of community and local government resistance has not been accepted as viable and that this Court was 'unable to avoid the conclusion that the Secretary's past actions constituted racial discriminatory conduct in their own right.' Gautreaux v. Romney, 448 F.2d 731 (7th Cir. 1971).
 
 
 5
 During the progress of this litigation, HUD was conferring with the City of Chicago concerning grants under the Model Cities Program (established by the Demonstration Cities and Metropolitan Development Act of 1966, 42 U.S.C. 3301 et seq.). A $38 million grant was made for the calendar year 1970. However, for the 1971 calendar year HUD required a 'letter of intention' signed by the Mayor of Chicago, the Chairman of CHA and the Regional Administrator of HUD, indicating how Chicago's large housing deficiency would be met. Under this letter CHA was to acquire sites for 1700 units within a specified timetable. HUD approved $26 million and had released $12 million when the opinion in Romney, supra came down. Appellants then sought an injunction from the District Court restraining further payments by HUD under the Model Cities Program unless and until sites in predominantly white areas for 700 dwelling units had been certified to the City Council for approval (at the time only 288 had been approved). The District Court granted this relief but on appeal the order was reversed. 457 F.2d 124 (7th Cir. 1972). On remand the District Court entered a summary judgment against HUD, consolidated the cases and entered an order calling for each of the parties to file suggestions for a 'comprehensive plan' to remedy the past effects of the public housing segregation, including 'alternatives which are not confined in their scope to the geographic boundary of the City of Chicago.'
 
 
 6
 HUD proposed a 'best efforts' judgment order under which it would 'cooperate' with CHA in the latter's efforts to increase the supply of housing units in accordance with the earlier judgment order against CHA and reported in 304 F.Supp. 736. Its proposed relief was confined to the geographic boundaries of the City of Chicago. Its 'best thinking' was that the letter of intention previously mentioned and signed by the Mayor, the Regional Administrator of HUD and CHA should be carried out. This letter only covered the matter of the relocation housing deficiency of 4300 units and did not spell out any 'comprehensive plan to remedy the past effects'. Appellants' proposed plan provided a mechanism by which CHA could supply remedial housing in suburban areas as well as within Chicago and required HUD to administer its programs affirmatively to ensure that the order was carried out. At the hearing the appellants introduced evidence of the need for a metropolitan plan and the unreliability of HUD's 'best efforts'. HUD offered evidence of the lack of funds then available and CHA offered no evidence. On December 8, 1972, Bradley v. Milliken, 484 F.2d 215 (6th Cir. 1972) came down, holding that a remedial plan involving suburban school districts in the metropolitan area of Detroit was necessary to disestablish existing segregation. Appellants then requested a 'Bradley plan' order. On September 11, 1973, the District Court sustained the HUD proposal and this appeal resulted.
 
 1. Scope of Review
 
 7
 We agree with the appellees that the District Court did not hold that it lacked power to adopt a metropolitan plan but rather that on the facts shown such relief was unwarranted. While neither CHA nor HUD concedes that the District Court has power to require compliance with a plan that includes areas outside the official boundaries of the City of Chicago, they both conclude that the District Judge's holding was not predicated on a lack of such power. At least until Milliken v. Bradley, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069, the law was clear that political subdivisions of the States may be readily bridged when necessary to vindicate federal constitutional rights. Ex parte Virginia, 100 U.S. 339, 25 L.Ed. 676 (1880); Brown v. Board of Education, 349 U.S. 294, 300-301, 75 S.Ct. 753, 99 L.Ed. 1083 (1954); Swann v. Board of Education, 402 U.S. 1, 27, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); Griffin v. County Board, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964); Bradley v. Milliken, 484 F.2d 215, 250 (6th Cir. 1973); Haney v. County Board, 410 F.2d 920 (8th Cir. 1969). The equal protection clause speaks to the state, and the state cannot escape its obligations under that clause by delegating some of its governmental functions to local units. Hall v. St. Helena Parish School Board, 197 F.Supp. 649 (E.D.La.1961), affirmed, 368 U.S. 515, 82 S.Ct. 529, 7 L.Ed.2d 521; Reynolds v. Sims, 377 U.S. 533, 575, 84 S.Ct. 1362, 12 L.Ed.2d 506; Hart v. Community School Board, 383 F.Supp. 699 (E.D.N.Y.1974). Cf. Hunter v. City of Pittsburgh, 207 U.S. 161, 178, 28 S.Ct. 40, 52 L.Ed. 151.
 
 
 8
 We turn then to the Supreme Court's opinions in Milliken v. Bradley. That case clarifies an important equitable limitation on the substantial body of law just cited but does not overrule it. The Chief Justice's opinion for the Court assumes arguendo that the actions of local government are attributable to the state, 418 U.S. 748, 94 S.Ct. 3112, and it notes that school district lines are not sacrosanct if they conflict with the Fourteenth Amendment, 418 U.S. 744, 94 S.Ct. 3112. However, 'proceeding from . . . basic principles (of remedies),' 418 U.S. 737-738, 94 S.Ct. 3124, the Court holds that metropolitan relief does not follow automatically from these premises, 418 U.S. 748, 94 S.Ct. 3112. Boundary lines may be 'bridged,' but not 'casually ignored.' Consolidation of 54 independent school districts would present overwhelming problems of logistics, finance, administration and political legitimacy. The Court gives great deference to the 'deeply rooted' and 'essential' tradition of local control of the public schools. Unless the Michigan legislature completely restructured relevant statutes, the District Judge would become both de facto legislature and metropolitan school superintendent, 418 U.S. 743-744, 94 S.Ct. 3112. The conclusion that inter-district school desegregation is 'in order' and 'appropriate' only where there has been what the Court terms 'an inter-district violation' (418 U.S. 745, 94 S.Ct. 3112) must be read in this light. Only an inter-district violation justifies incurring all the difficulties attendant on inter-district school desegregation.
 
 
 9
 This reading of the opinion is conclusively reinforced by Justice Stewart's concurrence, which expressly states the holding:
 
 
 10
 'the Court does not deal with questions of substantive constitutional law. The basic issue now before the Court concerns, rather, the appropriate exercise of federal equity jurisdiction.
 
 
 11
 . . . .doe
 
 
 12
 'The opinion of the Court convincingly demonstrates . . . that traditions of local control of schools, together with the difficulty of a judicially supervised restructuring of local administration of schools, render improper and inequitable such an interdistrict response to a constitutional violation found to have occurred only within a single school district.' 418 U.S. 753, 94 S.Ct. 3131.
 
 
 13
 Justice Stewart's view is pivotal because his vote makes a majority when added to any of the other opinions. It is also significant that the Chief Justice's opinion does not indicate any disagreement with Justice Stewart's understanding.
 
 
 14
 Milliken v. Bradley therefore fits into an established line of precedent. Beginning in Brown I, the Court recognized that remedial complexities may limit or delay implementation of the constitutional right to school desegregation. 347 U.S. 483, 495, 74 S.Ct. 686, 98 L.Ed. 873. In Brown II, the Court emphasized local school problems, and in a passage quoted by both the Chief Justice and Justice Stewart in Milliken, reminded that 'Traditionally, equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs.' 349 U.S. 294, 300, 75 S.Ct. 753, 756, 99 L.Ed. 1083. Long experience in reconciling practical problems with demands for total desegregation eventually resulted in the following rule:
 
 
 15
 'Having once found a violation, the district judge or school authorities should make every effort to achieve the greatest possible degree of actual desegregation, taking into account the practicalities of the situation.' Davis v. Board of School Comm'rs, 402 U.S. 33, 37, 91 S.Ct. 1289, 1292, 28 L.Ed.2d 577.
 
 
 16
 An alternative phrasing is the requirement 'that all reasonable methods be available to formulate an effective remedy.' North Carolina State Board of Education v. Swann, 402 U.S. 43, 46, 91 S.Ct. 1284, 1286, 28 L.Ed.2d 586. We understand Milliken v. Bradley to hold that the relief sought there would be an impractical and unreasonable over-response to a violation limited to one school district.
 
 
 17
 In view of the dominant theme of the majority opinion as a whole, the fact that any application of the opinion to factual situations other than the one before the Court would be dictum, and particularly in view of Justice Stewart's opinion for the fifth vote, we conclude that the majority opinion in Milliken v. Bradley deals with equitable limitations on remedies.
 
 
 18
 Our task therefore, and that of the District Judge, is to determine how great a degree of public housing desegregation is practical. Milliken v. Bradley dealt only with schools. Public housing may be quite different; indeed, both the Chief Justice's and Justice Stewart's opinions implied that the result as to schools might be different if housing discrimination were shown 418 U.S. 728, n. 7, 94 S.Ct. 3112; 418 U.S. 754-755, 94 S.Ct. 3112. Compare Watson v. City of Memphis, 373 U.S. 526, 532-534, 83 S.Ct. 1314, 1319, 10 L.Ed.2d 529 holding that because
 
 
 19
 'desegregation of parks and other recreational facilities does not present the same kinds of cognizable difficulties inhering in elimination of racial classification in schools, . . . it is patent . . . that the principles enunciated in the second Brown decision have absolutely no application (to parks).'
 
 
 20
 2. A Metropolitan Plan is Necessary and Equitable
 
 
 21
 After careful consideration and reflection we are obliged to conclude that on the record here it is necessary and equitable that any remedial plan to be effective must be on a suburban or metropolitan area basis. This could entail additional time but not under proper management since the intra-city portion of the plan may proceed without any further delay. In the meanwhile the suburban or metropolitan phases of the plan can be perfected (new parties, if necessary, etc.) and effectuated without delaying or interfering with the intracity phase of the comprehensive plan. There are only five housing authorities (in addition to CHA) involved, and while voluntary cooperation is not indicated, a Court order directing that those not volunteering were to be made parties might help. On the record here we are not able to discuss-- much less pass upon-- the validity of any specific metropolitan plan. We leave that for the district court on remand.
 
 
 22
 Our decision in regard to the necessity and equity of suburban or metropolitan area action is predicated on the following:
 
 
 23
 The equitable factors which prevented metropolitan relief in Milliken v. Bradley are simply not present here. There is no deeply rooted tradition of local control of public housing; rather, public housing is a federally supervised program with early roots in federal statutes. See 42 U.S.C. 1401 et seq.; Gautreaux v. Romney, 448 F.2d 731, 737-740 (7th Cir. 1971). There has been a federal statutory commitment to non-discrimination in housing for more than a century, 42 U.S.C. 1982, and the Secretary of HUD is directed to administer housing programs 'in a manner affirmatively to further the policies' of non-discrimination, 42 U.S.C. 3608(d)(5). In short, federal involvement is pervasive.
 
 
 24
 Similarly, the administrative problems of building public housing outside Chicago are not remotely comparable to the problems of daily bussing thousands of children to schools in other districts run by other local governments. CHA and HUD can build housing much like any other landowner, and whatever problems arise would be insignificant compared to restructuring school systems as proposed in Milliken v. Bradley.
 
 
 25
 In Milliken v. Bradley, the Chief Justice emphasized that there was no evidence of discrimination by the suburban school districts affected. Here, although the record was not made with the Supreme Court's Milliken opinions in mind, there is evidence of suburban discrimination. Plaintiff's Exhibit 11 indicates that of twelve suburban public housing projects, ten were located in or adjacent to overwhelmingly black census tracts. And although the case was not limited to public housing, it is not irrelevant that we recently took judicial notice of widespread residential segregation 'in Chicago and its environs.' Clark v. Universal Builders, Inc., 501 F.2d 324, p. 335 (7th Cir. 1974). We went on to hold that a prima facie showing had been made that this segregation had discriminatory effects throughout the metropolitan area.
 
 
 26
 Finally, the possibility of metropolitan relief has been under consideration for a long time in this case. While they disagree as to what relief the District Court should order, the parties are in agreement that the metropolitan area is a single relevant locality for low rent housing purposes and that a city-only remedy will not work.
 
 
 27
 The HUD General Counsel is quoted as saying:
 
 
 28
 'The provisions in State housing authorities laws which authorize a city housing authority to operate . . . in a county or other city with the consent of the governing body concerned, were included in these laws because it was realized that many cities would have to utilize the areas outside their borders in meeting their low-rent housing needs. It was recognized that the elimination of slums and the provision of decent housing for families of low income in the locality are matters of metropolitan area scope but of primary concern to the central city because the problem and impact are intensified there. In effect, therefore, the State legislatures have determined that the city and its surrounding area comprise a single 'locality' for low-rent housing purposes.' (Pls.' Exh. 13, pp. 3-4).
 
 
 29
 Likewise, an applicable HUD regulation states in part: 'Housing market areas often are independent of arbitrary political boundaries . . .'. (Pls.' Exh. 16, p. 1).
 
 
 30
 And CHA itself in a memorandum of December 21, 1971, (Record Doc. 167 at p. 27) said:
 
 
 31
 'CHA fully agrees that public housing must be metropolitan in nature, and not confined to the City of Chicago. It has so stated on numerous occasions before this court. It has offered testimony that a dispersal program for public housing will not work unless it is operated on a metropolitan basis.'
 
 HUD has taken a similar position:
 
 32
 'The impact of the concentration of the poor and minorities in the central city extends beyond the city boundaries to include the surrounding community. The City and the suburbs together make up what I call the 'real city.' To solve problems of the 'real city', only metropolitan-wide solutions will do.' (Statement by Secretary Romney, Appendix Z, pp. 15-16, to HUD's Memorandum, December 17, 1971, Record Doc. 283, Attachment 6, Memorandum 2, p. 2.)
 
 
 33
 And Samuel J. Simmons, former Assistant Secretary for Equal Opportunity of HUD, said:
 
 
 34
 'Central cities are losing Whites and gaining Blacks. In spite of a gradual increase in the number of Blacks and other minorities living in the suburbs, the fact of the White noose around the country's largest cities is a largely unchanged reality. The White trek to the suburbs has continued unabated in the last ten years and in the majority of the large metropolitan areas White and Blacks still live largely separate lives . . . It is impossible to solve central city problems in the central city alone.' (Pls.' Exh. 7, pp. 3-4.)
 
 
 35
 In fact, HUD joined the appellants in a joint representation to the District Judge that 'the parties are of the view that a metropolitan remedy is desirable.' Tr. pp. 4, 6, Feb. 22, 1972. While it later said: 'it is by no means clear' that a metropolitan remedy is necessary, it reaffirmed subsequently 'the desirability of a metropolitan wide plan' and explained that its previous statement was only raising 'various legal objections to the particular plan plaintiffs have proposed . . .' Tr. Rec.Doc. 310 p. 7-10 HUD Memorandum.
 
 
 36
 In addition to CHA's and HUD's strong, positive statements as to the necessity for a metropolitan plan here, the appellants also offered the testimony of a recognized demographer who estimated that a continuance of present trends in black and white census tracts would lead to at least a 30 percent black occupancy in every census tract in Chicago by the year 2000. The District Judge himself added support to this thesis; however his prediction was 1984:
 
 
 37
 'Existing patterns of racial separation must be reversed if there is to be a chance of averting the desperately intensifying division of Whites and Negroes in Chicago. On the basis of present trends of Negro residential concentration and of Negro migration into and White Migration out of the central city, the President's Commission on Civil Disorders estimates that Chicago will become 50% Negro by 1984. By 1984 it may be too late to heal racial divisions.' (296 F.Supp. 907, 915).
 
 
 38
 If this prediction comes true it will mean that there will be no 'general Public Housing Area' left in Chicago on which CHA could build desegregated public housing. In the ten-year period 1960-1970 the population of the City of Chicago declined by 183,000 people, a decrease of 505,000 whites and an increase of 322,000 blacks. The expert demographer further testified that by providing desegregated housing opportunities in the suburban areas, the rate of white exodus from the city would diminish. There was no testimony to the contrary. In fact 'White flight' has brought on the same condition in most of our metropolitan cities, such as Indianapolis, Indiana. See United States v. Board of School Commissioners, 332 F.Supp. 655, 676 (S.D.Ind.1971); also as to Atlanta, Georgia; Calhoun v. Cook, 332 F.Supp. 804, 805 (N.D.Ga.1971). Like conditions-- but aggravated-- exist in Washington, D.C. and Cleveland, Ohio.
 
 
 39
 The realities of 'White flight' to the suburbs and the inevitability of 'resegregation' by rebuilding the ghettos as CHA and HUD were doing in Chicago must therefore be considered in drawing a comprehensive plan. The trial judge back in 1969 ordered scattered-site, lowrise housing-- despite much criticism-- but the experts now agree that such requirements are mandatory. His warning that 'By 1984 it may be too late to heal racial divisions', rather than a cliche, is a solemn warning as to the interaction of 'White flight' and 'black concentration'. It is the most serious domestic problem facing America today. As Assistant Secretary Simmons further advises:
 
 
 40
 'As Whites have left the cities, jobs have left with them. After 1960, three-fifths of all new industrial plants constructed in this country were outside of central cities. In some cases as much as 85% Of all new industrial plants located outside central cities were inaccessible to Blacks and other minorities who swelled ghetto populations.' (Pls.' Exh. 9, p. 3).
 
 
 41
 These words also convey a solemn warning, i.e., we must not sentence our poor, our underprivileged, our minorities to the jobless slums of the ghettos and thereby forever trap them in the vicious cycle of poverty which can only lead them to lives of crime and violence.
 
 
 42
 By way of concluding, we have carefully read the records in these cases and find no evidence that the suburban or metropolitan area should not be included in a comprehensive plan. All of the parties, the Government officials, the documentary evidence, the sole expert and the decided cases agree that a suburban or metropolitan area plan is the sine qua non of an effective remedy. In fact the Judge himself recognized its importance in his original judgment order by authorizing housing units to be provided in suburban Cook County on a voluntary basis. See 304 F.Supp. at 739. Furthermore, in his order of December 23, 1971, calling for the preparation by the parties of a 'comprehensive plan', he wisely included the following paragraph:
 
 
 43
 '3. In the preparation of such plan or plans, the parties are requested to provide the Court with as broad a range of alternatives as seem to the parties feasible as a partial or complete remedy for such past effects, including, if the parties deem it necessary or appropriate to provide full relief, alternatives which are not confined in their scope to the geographic boundary of the City of Chicago.'
 
 
 44
 In light of all of these considerations we can but conclude that the District Court's finding as to not including in a comprehensive plan of relief areas outside the City of Chicago, i.e., the suburban or metropolitan area, was clearly erroneous.
 
 3. Action on Remand
 
 45
 The judgment order of September 11, 1973, is reversed and the causes are remanded for further consideration in the light of this opinion, to wit: the adoption of a comprehensive metropolitan area plan that will not only disestablish the segregated public housing system in the City of Chicago which has resulted from CHA's and HUD's unconstitutional site selection and tenant assignment procedures but will increase the supply of dwelling units as rapidly as possible.
 
 
 46
 It is so ordered.
 
 ORDER
 On Rehearing
 
 47
 Mr. Justice CLARK.
 
 
 48
 On rehearing, we reaffirm our view that the trial judge should not have refused to 'consider the propriety of metropolitan area relief.' His conclusion that the only factual basis for plaintiffs' request was the opinion of an urbanologist ignores much of the record and, in particular, the statements of the parties themselves to the effect that 'only metropolitan-wide solutions will do.'
 
 
 49
 The requested relief does not go 'far beyond the issues of this case,' as the trial judge suggests. Rather, it is reasonable to conclude from the record[3] that defendants' discriminatory site selection within the City of Chicago may well have fostered racial paranoia and encouraged the 'white flight' phenomenon which has exacerbated the problems of achieving integration to such an extent that intra-city relief alone will not suffice to remedy the constitutional injuries. The extra-city impact of defendants' intra-city discrimination appears to be profound and far-reaching and has affected the housing patterns of hundreds of thousands of people throughout the Chicago metropolitan region.
 
 
 50
 It is in this sense, we believe, that the Supreme Court requires a showing that 'there has been a constitutional violation within one district that produces a significant segregative effect in another district.' Milliken v. Bradley, 418 U.S. at 745, 94 S.Ct. at 3127. We therefore reaffirm our remanding of this case for additional evidence and for further consideration of the issue of metropolitan area relief in light of this opinion and that of the Supreme Court in Milliken v. Bradley. In the meantime, intra-city relief should proceed apace without further delay.
 
 
 51
 A majority of the judges in regular active service not having requested that a vote be taken on the suggestion for an en banc rehearing, and a majority of the panel having voted to deny a rehearing,
 
 
 52
 It is ordered that the petition of the appellees for a rehearing in the aboveentitled appeal be, and the same is hereby denied.
 
 
 53
 TONE, Circuit Judge, adheres to his prior dissent.
 
 TONE, Circuit Judge (dissenting)
 
 54
 I respectfully dissent based on my reading of the majority decision in Milliken v. Bradley, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974). I recognize that that case involved facts significantly different from those in the case at bar, but the 'controlling principle' stated and applied there seems to me to be applicable here. That principle is that the remedy must be commensurate with the constitutional violation found, and, therefore, an inter-district remedy is not justified unless the evidence shows an inter-district violation. (418 U.S. 744 and 756, 94 S.Ct. 3112.) This seems to me to preclude metropolitan relief here. No violation outside the city has even been alleged, let alone proved, as the District Court pointed out. Compare, United States v. Board of School Comm. of City of Indianapolis, 503 F.2d 68, at 78-80, 86 (7th Cir. 1974).
 
 
 55
 I do not disagree with this court's persuasive argument that a metropolitan plan is needed to reduce segregation in the metropolitan area. The record does not support that relief in this case, however, in view of the stricture of Milliken v. Bradley.
 
 
 
 [1]
 Associate Justice Tom C. Clark of the Supreme Court of the United States (Ret.) is sitting by designation
 
 
 [2]
 For a detailed statement of the facts see the dissenting opinion of Judge Sprecher, 457 F.2d at 129
 
 
 [3]
 The trial judge himself made the following statement in his 1969 opinion in this matter:
 'Two further results of CHA's participation in a policy of maintaining existing patterns of residential separation of the races must be mentioned. First, as Dr. Baron's Affidavit discloses, the 188,000 White families eligible for public housing have understandably chosen in the main to forego their opportunity to obtain low cost housing rathther than to move into all Negro projects in all Negro neighborhoods. This is an ironic but predictable result of a segregationist policy of protecting Whites from less than half as many (76,000) eligible Negro families. Second, existing patterns of racial separation must be reversed if there is to be a chance of averting the desperately intensifying division of Whites and Negroes in Chicago. On the basis of present trends of Negro residential concentration and of Negro migration into and White migration out of the central city, the President's Commission on Civil Disorders estimates that Chicago will become 50% Negro by 1984. By 1984 it may be too late to heal racial divisions.' Gautreaux v. Chicago Housing Authority, 296 F.Supp. 907, 915 (N.D.Ill.1969).