**SOUTHERN ALAMEDA SPANISH SPEAKING ORGANIZATION (also known as SASSO); et al., Plaintiffs-Appellants,**

v.

**CITY OF UNION CITY, CALIFORNIA, et al., Defendants-Appellees.**

No. 25195.

United States Court of Appeals, Ninth Circuit.

March 16, 1970.

Richard F. Bellman and Lewis M. Steel (argued), New York City, Johnathan Rutledge, D'Army Bailey, Cruz Reynoso, San Francisco, Cal., Sol Rabken and Robert Carter, New York City, for appellants.

John V. Trump (argued), of Bell, Trump, Sheppard & Raymond, Fremont, Cal., for appellees.

Anthony J. Garcia, San Leandro, Cal. and Pete Tijerina, Mario Obledo, San Antonio, Tex., for Mexican-American Defense and Education Fund, Farber & McKelvey, Seymor Farber and Edwin Lukas, San Francisco, Cal., for American Jewish Congress and American Jewish Committee, amicus curiae.

Before MERRILL and KOELSCH, Circuit Judges, and TAYLOR, District Judge [*].

MERRILL, Circuit Judge:

The principal appellant, the Southern Alameda Spanish Speaking Organization (SASSO), was successful in obtaining the passage of a city ordinance rezoning a tract of land within Union City, California, to a multi-family residential category in order to permit the construction of a federally financed housing project for low and moderate income families. The ordinance was nullified almost immediately by a city-wide referendum. By this action appellants attack the referendum [1] and its results as infringing upon their constitutional rights under the due process and equal protection clauses of the Fourteenth Amendment, and seek injunctive action directing Union City to implement the zoning change notwithstanding the referendum.

In the District Court appellants sought, under 28 U.S.C. § 2281,[2] an order convening a three-judge court to entertain their constitutional claims. They also moved for a preliminary injunction directing Union City to put the zoning changes into effect *pendente lite*. The District Court ruled against the appellants on both motions and that order is the subject of this appeal.

As incorporated in 1959 Union City combined two existing communities known as Decoto and Alvarado. The area was largely agricultural and the two communities were inhabited almost exclusively by Mexican-American residents.

[*] Honorable Fred M. Taylor, United States District Judge for the District of Idaho, sitting by designation.

1. The original complaint was filed prior to the holding of the referendum and sought to enjoin the referendum itself. When appellants failed to secure that injunction, an amended and supplementary complaint was filed asserting the claims now presented.

2. 28 U.S.C. § 2281 provides:
"An interlocutory or permanent injunction restraining the enforcement, operation or execution of any State statute by restraining the action of any officer of such State in the enforcement or execution of such statute, or of an order made by an administrative board or commission acting under State statute, shall not be granted by any district court or judge thereof, upon the ground of the unconstitutionality of such statute unless the application therefor is heard and determined by a district court of three judges under section 2284 of this title."

Since incorporation Union City has absorbed residents both from Oakland to the north and San Jose to the south. The population has risen from about 6600 in 1960 to the current 14,000. · During the same period the composition of the population has also changed; the Mexican-American percentage has declined from 55 per cent to about 35–40 per cent of the total.

A master plan for Union City was formally adopted in 1962, after public hearings. Under that plan, vacant land not then in use was generally zoned as agricultural, a "holding" classification subject to rezoning by city ordinance for urban use at the appropriate time. The plan did, however, anticipate future use and zoning. The land here in question (the "Baker Road Tract") was zoned agricultural under the plan but designated for purposes of rezoning as appropriate for single-family dwellings.

Since 1962, suburban pressures have created an increasing need for multifamily housing in Union City and several such units have already been accommodated through rezoning ordinances. These units have largely gone to meet the needs of new residents. The old residents of Decoto and Alvarado, due to limited incomes, have been unable to enjoy the housing so provided, and have had to remain in those districts, where a substantial portion of the housing is rated substandard. In 1967, city officials concerned with housing problems contracted with a consulting firm for a comprehensive study of local housing requirements. That study, still incomplete, has resulted in a number of recommendations and a draft master plan. The firm recommended that the city encourage housing projects for families with low and moderate incomes, sponsored by nonprofit corporations and financed through federal aid. The projected master plan designates the tract in question for multi-family dwellings. Although the 1962 plan has not been formally superseded, city officials have in large part accepted the firm's recommendations. They have informally abandoned the 1962 plan's designations of appropriate future use in favor of the updated designations regarded as more appropriate in light of the city's growth.

Appellant SASSO is qualified to sponsor federally assisted housing developments for low income persons and was organized for the purpose of improving housing and living conditions for the Spanish speaking people of Southern Alameda County. In December, 1968, it obtained an option to purchase the Baker Road tract, where it planned to construct a 280-unit medium density housing project. In accordance with this objective, SASSO applied to the City Planning Staff of Union City for rezoning. After appropriate studies, the Planning Staff recommended the application to the Planning Commission. Several months later the Planning Commission's recommendation for rezoning (medium density multi-family residential) was approved by the City Council after public hearings; an ordinance was passed on April 7, 1969.

The Baker Road tract is adjacent to several tracts of single-family homes. Opposition to the April 7 ordinance arose there and among other home owners; petitions seeking a referendum under § 4051, Cal. Elections Code,[3] were circulated and completed. Pursuant to § 4052, Cal. Elections Code,[4] the matter

---

3. § 4051, Cal.Elections Codes, provides:
"If a petition protesting against the adoption of an ordinance is * * * submitted to the clerk of the legislative body of the city within 30 days of the adoption of the ordinance and is signed by not less than 10 percent of the voters of the city * * * the effective date of the ordinance shall be suspended, and the legislative body shall reconsider the ordinance."

4. § 4052, Cal.Elections Code, provides:
"If the legislative body does not entirely repeal the ordinance against which the petition is filed, the legislative body shall submit the ordinance to the voters, either at a regular municipal election * * * or at a special election * * *. The ordinance shall not become effective until a majority of the voters voting on the ordinance vote in favor of it. If the legis-

was submitted to the voters of Union City, who by a vote of 1149 to 845 rejected the ordinance. The referendum automatically restored the Baker Road tract to the agricultural holding category and the City Council was barred from rezoning the tract for medium density, multi-residential dwellings for a period of one year.

### 1. *Police Power and Due Process*

Appellants initially challenge the constitutionality of California's referendum procedures as applied to the zoning process. They contend that "referendum zoning" violates due process requirements.

The rights asserted are those of a landowner (SASSO) [5] to be free from arbitrary restrictions on land use. Appellants assert that regulation of land use by zoning is constitutionally permissible only where procedural safeguards assure that the resulting limitations have been determined, by legislatively promulgated standards, to be in the interest of public health, safety, morals, or the general welfare. They contend that the referendum process destroys the necessary procedural safeguards upon which a municipality's power to zone is based and subjects zoning decisions to the bias, caprice and self-interest of the voter. They rely on Washington ex rel. Seattle Title Trust Co. v. Roberge, 278 U.S. 116, 49 S.Ct. 50, 73 L.Ed. 210 (1928), and Eubank v. City of Richmond, 226 U.S. 137, 33 S.Ct. 76, 57 L.Ed. 156 (1912).

Appellants' reliance on these cases is misplaced. There, local ordinances permitted residents of a neighborhood, by majority vote (*Eubank*) or by withholding consent (*Washington*), to impose restrictions that otherwise had not legislatively been determined to be in the public interest. The resulting rule, as applied to appellants' contentions respect-

ing procedural safeguards, would seem to be that an expression of neighborhood preference for restraints, uncontrolled by any legislative responsibility to apply acceptable public interest standards, is not such a determination of what is in the public interest as will justify an exercise of the police power to zone.

A referendum, however, is far more than an expression of ambiguously founded neighborhood preference. It is the city itself legislating through its voters—an exercise by the voters of their traditional right through direct legislation to override the views of their elected representatives as to what serves the public interest. See Spaulding v. Blair, 403 F.2d 862 (4th Cir. 1968). This question lay at the heart of the proposition put to the voters. That some voters individually may have failed to meet their responsibilities as legislators to vote wisely and unselfishly cannot alter the result.

Nor can it be said that the resulting legislation on its face was so unrelated to acceptable public interest standards as to constitute an arbitrary or unreasonable exercise of the police power. See Washington ex rel. Seattle Title Trust Co. v. Roberge, *supra*; Eubank v. City of Richmond, *supra*; Euclid, Ohio v. Ambler Realty Co., 272 U.S. 365, 395, 47 S.Ct. 114, 71 L.Ed. 303 (1926). Many environmental and social values are involved in a determination of how land would best be used in the public interest. The choice of the voters of Union City is not lacking in support in this regard.

■ Thus in the present case neither the zoning process itself nor the result can be said to be such an arbitrary or unreasonable exercise of the zoning power as to be violative of appellants' right to due process of law. We agree with the District Court that no substantial

---

lative body repeals the ordinance or submits the ordinance to the voters and a majority of the voters voting on the ordinance do not vote in favor of it, the ordinance shall not again be enacted by the legislative body for a period of one year after the date of its re-

peal by the legislative body or disapproval by the voters."

5. SASSO at the time held an option to purchase the Baker Road tract, for which it had paid $6,000, subject to forfeit.

constitutional question was presented by appellants' due process contentions, and that they warranted neither a three-judge court [6] nor a preliminary injunction.[7]

## 2. Equal Protection

Appellants contend that both the purpose and the result of the referendum were to discriminate racially and economically against the Mexican-American residents of Union City. They assert that the referendum was racially motivated and that its result was to perpetuate discrimination in Union City against Mexican-American residents with low incomes.

Under the facts of this case we do not believe that the question of motivation for the referendum (apart from a consideration of its effect) is an appropriate one for judicial inquiry. In this respect, Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967), is distinguishable.

There a constitutional amendment, adopted by the people of California through a statewide ballot, resulted in the repeal of existing fair housing laws and prohibited all legislative action abridging the rights of persons to sell, lease or rent property to whomsoever they chose. In examining the constitutionality of the amendment, its purpose was treated as a relevant consideration.

Purpose was judged, however, in terms of ultimate effect and historical context. The only existing restrictions on dealings in land (and thus the obvious target of the amendment) were those prohibiting private discrimination. The only "conceivable" purpose, judged by wholly objective standards, was to restore the right to discriminate and protect it against future legislative limitation.

The amendment was held to constitute impermissible state involvement (in the nature of authorization or encouragement) with private racial discrimination. 387 U.S. at 381, 87 S.Ct. 1627.

The case before us is quite different. As we have noted, many environmental and social values are involved in determinations of land use. As the District Court noted, " * * * [T]here is no more reason to find that [rejection of rezoning] was done on the ground of invidious racial discrimination any more than on perfectly legitimate environmental grounds which are always and necessarily involved in zoning issues."

If the voters' purpose is to be found here, then, it would seem to require far more than a simple application of objective standards. If the true motive is to be ascertained not through speculation but through a probing of the private attitudes of the voters, the inquiry would entail an intolerable invasion of the privacy that must protect an exercise of the franchise. Spaulding v. Blair, supra.

Appellants' equal protection contentions, however, reach beyond purpose. They assert that the effect of the referendum is to deny decent housing and an integrated environment to low-income residents of Union City. If, apart from voter motive, the result of this zoning by referendum is discriminatory in this fashion, in our view a substantial constitutional question is presented.

Surely, if the environmental benefits of land use planning are to be enjoyed by a city and the quality of life of its residents is accordingly to be improved, the poor cannot be excluded from enjoyment of the benefits. Given the recognized importance of equal opportunities in housing,[8] it may well be, as matter of

6. In so ruling on the substantiality of the constitutional challenge to the California statute, we avoid considering whether the other prerequisites for three-judge court jurisdiction under 28 U.S.C. § 2281 are satisfied. See note 2, *supra.*

7. We note that on similar facts the 6th Circuit through somewhat different rea-

soning reached the same result. Ranjel v. City of Lansing, 417 F.2d 321, 324 (6th Cir. 1969), cert. denied, 397 U.S. 980, 90 S.Ct. 1105, 25 L.Ed.2d 390 (1970)

8. See Hunter v. Erickson, 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969); Jones v. Alfred H. Mayer Co., 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968);

law, that it is the responsibility of a city and its planning officials to see that the city's plan as initiated or as it develops accommodates the needs of its low-income families, who usually—if not always—are members of minority groups.[9] It may be, as matter of fact, that Union City's plan, as it has emerged from the referendum, fails in this respect. These issues remain to be resolved.

■ They do not, however, call for a three-judge court under 28 U.S.C. § 2281. It is not state law that has brought about the condition in Union City and the validity of state law is not drawn in question. State law has enabled Union City to act, but appellants' challenge is directed not against the state's grant of power but against the manner in which the city has exercised that power.[10]

■ Nor do we feel that denial of preliminary injunction constituted abuse of discretion. An injunction here would not serve to freeze the status quo but would require that affirmative steps now be taken in the direction of the ultimate remedy sought by appellants. The fact that discrimination resulted from the referendum, and that Union City has failed to make satisfactory provision for low-income housing, is not so clear as to demand preliminary relief of this nature.

The order of the District Court is affirmed.

Reitman v. Mulkey, *supra*; Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948); Block v. Hirsh, 256 U.S. 135, 41 S.Ct. 458, 65 L.Ed. 865 (1921).

9. In Norwalk CORE v. Norwalk Redevelopment Agency, 395 F.2d 920 (2d Cir. 1968), the 2d Circuit has endorsed this broader view of equal protection within a housing context. That case held that plaintiffs had a cause of action even where there was no showing of discrimination in housing opportunities [failure to relocate persons displaced by urban renewal projects] brought about by public officials. *Id.* at 932. As the court there stated:

"The fact that the discrimination is not inherent in the administration of the program * * * surely does not excuse the planners from making sure that there is available relocation housing for all displacees. 'Equal protection of the laws' means more than merely the absence of governmental action designed to discriminate; as Judge J. Skelley Wright has said, 'we now firmly recognize that the arbitrary quality of thoughtlessness can be as disastrous and unfair to private rights and public interest as the perversity of a willful scheme.' Hobson v. Hansen, 269 F.Supp. 401, 497 (D.D.C.1967)." 395 F.2d at 931.

10. For the same reason, discriminatory purpose similar to that found in Reitman v. Mulkey, *supra*, would present no three-judge issue.