**CITIZENS COMMITTEE FOR FARADAY WOOD et al., Plaintiff-Appellants,**

v.

**John V. LINDSAY, Mayor of the City of New York, et al., Defendants-Appellees.**

**No. 17, Docket 73–2590.**

United States Court of Appeals, Second Circuit.

Argued Sept. 24, 1974.

Decided Dec. 5, 1974.

Certiorari Denied April 28, 1975.

See 95 S.Ct. 1679.

Richard F. Bellman, Tarrytown, N. Y. and Lewis M. Steel, New York City (Eisner, Levy & Steel, New York City, on the brief), for plaintiffs-appellants.

Leonard Koerner, New York City (Adrian P. Burke, Corp. Counsel of the City of New York, L. Kevin Sheridan and Frances Loren, New York City, on the brief), for defendants-appellees.

Before LUMBARD, FEINBERG and OAKES, Circuit Judges.

LUMBARD, Circuit Judge:

Plaintiffs appeal from a judgment dated September 10, 1973, of the Southern District, Robert J. Ward, J., dismissing their complaint after a trial without a jury.[1] D.C., 362 F.Supp. 651. The plaintiffs brought a class action on behalf of all New York City residents who reside in inadequate and deteriorating housing and who would qualify for residence within low-income public housing units. They sought declaratory and injunctive relief against New York City, its mayor, the city's Housing and Development Administration (HDA) and HDA's administrator on the grounds that the city's decision not to proceed with a publicly financed housing project for middle- and low-income families on an eight-acre plot known as Faraday Wood in the North Riverdale section of the Bronx violated the equal protection clause of the Fourteenth Amendment in that it was motivated by racial considerations and had a racially discriminatory effect. In addition, one of the named plaintiffs, the

---

1. The case was tried before the late Judge Edward C. McLean. After Judge McLean's death in October 1972 the case was assigned to Judge Ward. The parties stipulated that Judge Ward could decide the case on the record made before Judge McLean. While in such a case we have the power to set aside the findings of the district judge even if they are not clearly erroneous since we can evaluate the written record as well as he can, see Orvis v. Higgins, 180 F.2d 537 (2d Cir. 1950), cert. denied, 340 U.S. 810, 71 S.Ct. 37, 95 L.Ed. 595 (1950), we find ourselves in basic agreement with Judge Ward's findings.

Association for Middle Income Housing, Inc. (AMIH), the sponsor of the project, asserted that the city's decision to terminate the project breached the city's contractual relationship with AMIH. The district court found that the plaintiffs failed to show that the defendants had purposefully engaged in racial discrimination in violation of the fourteenth amendment and that the city's action did not have an unconstitutionally discriminatory effect. It also dismissed the contract claim. We affirm.

New York City's scatter-site program for selecting public housing sites, first announced in 1966, was designed to promote the building of public housing in the less densely populated areas of the city. Faraday Wood was one of the sites selected under this program. The initial site plans for Faraday Wood included 150 housing units for low-income families and 150 housing units for moderate-income families. However, after public hearings[2] in the fall of 1967 Faraday Wood was designated for development under the Mitchell-Lama Act[3] as a housing development for middle-income families with 20% of the units reserved for low-income families. At the city's behest AMIH became the sponsor of the project and developed a preliminary plan for the Faraday Wood site, which envisioned one high-rise (twenty-story) building and several low-rise (six-story) buildings. On May 14, 1968, the City Planning Commission indicated that it would consider a formal application for a Mitchell-Lama project on the Faraday Wood site. On May 27th, the HDA advised AMIH that it had given the project preliminary approval subject to submission of acceptable building plans and availability of city funds. Final approval of the project was contingent upon approval of the building plans by the City Planning Commission and the Board of Estimate.

Although there was considerable community opposition to the project, the application was processed in the normal manner until August 1969. On August 8, 1969, however, in the midst of a mayoral primary election, the City Hall Press Office issued a press release that stated that John V. Lindsay, then seeking re-election as mayor of New York City, was opposed to the project because the site was allegedly unsuitable for high-rise construction and because the community was concerned about overcrowding in its schools.[4] Soon after the press release was issued the HDA stopped processing plans for the Faraday Wood site. An attempt was made to resurrect the project in a modified form in February 1970. AMIH proceeded to adapt its plans to this new proposal, but ultimately differences between the HDA and AMIH led to the termination of the Faraday Wood project in December 1970.

Judge Ward found that the technical problems advanced by the city as justifications for the project's termination were not substantial and that the termination actually occurred as a political response to community opposition. He concluded, however, that there was no purposeful discrimination on the part of the city because the community opposition was not, in the main, racially motivated. He also found that the termination did not have an unconstitutional racially discriminatory effect because 80% of the units in the project were reserved for middle-income families and thus the brunt of the project's termination was borne by those families. Unlike the case where low-income families are involved, there is no reason to assume that a disproportionate number of the middle-income families affected would be non-

---

**2.** The Faraday Wood project was only one of several projects that were discussed. At this point the city had made no firm decisions on what, if anything, to do with the Faraday Wood site.

**3.** The Mitchell-Lama Act is the popular name for the New York Limited-Profit Housing Companies Law, N.Y. Priv. Housing Law art. 2 (McKinney's Consol.Laws, c. 44B, 1962), as amended, (McKinney Supp. 1974).

**4.** At trial Mayor Lindsay denied that he had authorized the press release.

**1068**

white. After making these findings, Judge Ward applied the rational basis standard of equal protection review and found that the city's action did not violate that standard.

## I.

Traditionally courts have used two standards of review when faced with claims that a certain state action violates the equal protection clause.[5] Usually the state action is upheld if it has a rational basis. See, e. g., Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 31 S.Ct. 337, 55 L.Ed. 369 (1911). However, if the state action infringes upon a fundamental right (voting, travel) or is directed at a suspect class (race), the state is required to justify its action by showing a compelling state interest. See, e. g., Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). Since there is clearly no constitutional right of access to a certain quality of housing, Lindsey v. Normet, 405 U.S. 56, 74, 92 S.Ct. 862, 31 L.Ed.2d 36 (1972), cf. Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970), plaintiffs must establish that the city's action

impinges on a suspect class in order to qualify for the stricter compelling state interest standard.

While race has long been recognized as a suspect classification, low-income status has not been so recognized. San Antonio School District v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). Thus, plaintiffs must show that there was an impingement or a disproportionate effect on nonwhites when the city cancelled the Faraday Wood project. The district court concluded that no such effect was shown and we agree. Eighty per cent of the project was reserved for middle-income persons.[6] Since the apartments at Faraday Wood would have rented for at least $80 per room per month, the annual family income limitation for a four-room apartment would have been over $23,000. See N.Y. Private Housing Finance Law § 31 (McKinney Supp.1974). The existence of such a high income limitation for the majority of the project's occupants precludes a finding that the project's cancellation had a disproportionate effect on nonwhites. Indeed, the whole rationale for carefully scrutinizing gov-

**5.** In the alternative plaintiffs urge us to adopt an intermediate equal protection test—somewhere between the compelling interest standard and the traditional rational basis standard. The Supreme Court has seemed to apply such a test on several occasions. See, e. g., Reed v. Reed, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971); Eisenstadt v. Baird, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972). See generally Gunther, The Supreme Court, 1971 Term—Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection, 86 Harv. L.Rev. 1 (1972). This circuit also espoused such a test. E. g., Boraas v. Village of Belle Terre, 476 F.2d 806 (2d Cir. 1973); Green v. Waterford Bd. of Educ., 473 F.2d 629 (2d Cir. 1973). However, the Supreme Court reversed Boraas and analyzed the case under the rational basis standard of equal protection review. Village of Belle Terre v. Boraas, 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974). In light of that reversal and the Supreme Court's refusal to adopt an intermediate standard of review in San Antonio School Dist. v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973) (decided subsequent to the Second Circuit decision in Boraas), it is unclear whether the Court now accepts an

intermediate form of equal protection analysis. Cf. Cleveland Bd. of Educ. v. LaFleur, 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974) (citing Green, supra, with approval). In any event, even if we applied the "slightly, but perceptibly, more rigorous" test of rationality of Green, supra, 473 F.2d at 633, the result in this case would be the same, as we point out below.

Plaintiffs also have advanced a statutory claim based on the Fair Housing Act, 42 U.S.C. §§ 3601–3631 (1970). They do not specify how the Act is involved here, except to say that if they establish their constitutional claim, they will have established their statutory claim. Since they view whatever statutory claim they have as dependent on their constitutional claim, we need not discuss it. See Acevedo v. Nassau County, 500 F.2d 1078, at 1082 (1974).

**6.** Since plaintiffs had no complaint with the city's actions until August 1969, the project under consideration then—the 80%–20% project—is the proper measure against which the effect of the termination should be measured. The 50%–50% plan was never more than a tentative suggestion of how the site might be used. See note 2 supra.

ernmental actions that adversely affect traditional public housing projects is that these projects are designed for low-income persons and courts are not blind to the fact that racial minorities are disproportionately represented in the lower-income levels of our society. There is no disproportionate overrepresentation of minorities in middle-income levels.[7] Hence the assumption used in the typical public housing case is not valid here.

Plaintiffs' reliance on our decision in Kennedy Park Homes Assn., Inc. v. City of Lackawanna, 318 F.Supp. 669 (W.D.N. Y.), aff'd, 436 F.2d 108 (2d Cir. 1970), cert. denied. 401 U.S. 1010, 91 S.Ct. 1256, 28 L.Ed.2d 546 (1971) is misplaced. In that case we found that the city of Lackawanna was clearly segregated—98.9% of its nonwhite citizens lived in one of its three wards. The populations of the other two wards were only .2% and .01% nonwhite. The nonwhite ward was the least desirable residential area of the city because it contained a large steel plant. Moreover, it was a ghetto in the traditional physical sense—only one bridge connected it to the rest of the city and the city's nonwhites were largely contained in that one limited area of the city. Against this background we held that the city could not, absent a compelling interest, thwart the efforts of a private organization to build housing for *low-income* families in the white area of the city by, among other things, refusing to accede to a reasonable rezoning request. Other courts have reached similar results. See, e. g., Crow v. Brown, 332 F.Supp. 382 (N.D.Ga.1971), aff'd, 457 F.2d 788 (5th Cir. 1972); Dailey v. City

of Lawton, 425 F.2d 1037 (10th Cir. 1970); SASSO v. Union City, 424 F.2d 291 (9th Cir. 1970); Joseph Skillken & Co. v. Toledo, 380 F.Supp. 228 (N.D.Ohio, 1974). See also United Farmworkers of Fla. Housing Project, Inc. v. City of Delray Beach, 493 F.2d 799 (5th Cir. 1974).[8]

This case is clearly distinguishable from *Lackawanna.* First, in *Lackawanna,* and the other cases cited above, the housing projects were designed only for low-income persons. In such cases it was possible to say that nonwhites were disproportionately affected since only low-income persons were involved and since a disproportionate number of nonwhites are low-income persons. That is not true in this case. Second, in the cited cases a city acted to thwart a private developer's attempt to construct housing for low-income persons. The cities involved had no financial or other connection with the project. However, in this case, the governmental body that decided not to proceed with the project was the same one that initiated it and that was going to finance it. Instead of merely asking us to order the city to remove barriers to a private development, plaintiffs are asking us to enter a judgment "[o]rdering the defendants to secure for the plaintiffs an alternative site[9] in Riverdale upon which the defendants will make possible construction of a housing project for low-income and minority citizens of New York of substantially the same number of dwelling units as have been lost as a result of the illegal blockage of AMIH's Faraday Wood project." Such relief would clearly be inappropriate.

---

7. It is true, of course, that some nonwhites qualify for middle-income status, but the number is small. According to the 1970 census (based on 1969 figures) blacks and Puerto Ricans comprised only 6.1% of persons with incomes between $10,000 and $25,000 in the New York City SMSA. 1970 Census of Population, Characteristics of the Population, New York, Table 192.

8. Plaintiffs also cite several cases where courts have ordered cities to adopt nondiscriminatory site-selection policies for the placement of public housing projects. See, e.

g., Gautreaux v. Chicago Housing Authority, 503 F.2d 930 (7th Cir., 1974); Banks v. Perks, 341 F.Supp. 1175 (N.D. Ohio 1972). These cases are inapposite here because the plaintiffs never established that New York City followed a practice of discrimination in its general site-selection policies. On the contrary there was evidence that the city adopted a scatter-site program in 1966.

9. The original site has since been sold by its owner to the government of the Union of Soviet Socialist Republics.

Also, in *Lackawanna* the record clearly established that the city's actions had been motivated by improper racial considerations. Kennedy Park Homes Assn. v. City of Lackawanna, *supra*, 436 F.2d at 109, 113–114. Here, however, our reading of the record convinces us that the district court was correct in concluding that the project was terminated because of community opposition and that such opposition was not for the most part racially motivated. There was, for example, evidence in the record that demonstrated considerable community opposition to high-rise structures in general.[10] Plaintiffs' attempts to prove the existence of racial motives were largely based on descriptions of public meetings where some members of the audience spoke in opposition to the project. However, there were also those who spoke in favor of the project and many of the reasons advanced in opposition—opposition to high-rise construction, fear of overtaxing community facilities—could not be characterized as racist. Plaintiffs, and our dissenting brother, conclusively perceive racism where we and the district court do not. We think that such perception in this case confuses an area's desire to protect comparatively uncrowded living conditions with a desire to keep minorities out. It is simply not true that community opposition to the housing proposal here had to be based upon racism. Just because plaintiffs "know" that

the opposition was racist is not proof enough. In any event, the decision to terminate the project was made by city officials and plaintiffs did not establish that they were motivated by racial considerations, and, in fact, there was evidence that those officials were not motivated by such considerations and did not believe that the community opposition to the project was primarily racial in character.[11]

In *Lackawanna* we also stressed the historical background of the city's policy of discrimination and noted how it affected the city's nonwhites. Here, as noted above, there is no showing that the city's action had disproportionate effect on nonwhites since the project was designed mainly for middle-income persons.[12] Moreover, this project was only one of many city housing projects. The money tentatively allocated to the Faraday Wood project would be available for another housing project. In contrast, when a private developer is prevented from building public housing in a city, no such housing whatever is provided to the city's residents.

On the basis of Lindsey v. Normet, *supra*, and Palmer v. Thompson, 403 U.S. 217, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971), which held that a municipality could choose not to operate any swimming pools rather than operate them on a desegregated basis, we recently rejected a

10. The existence of high-rise structures in North Riverdale does not indicate a lack of bona fide opposition to such structures on the part of many of the community's citizens. In fact, a February 1968 report by a consulting firm employed by the New York City Planning Commission indicated that "[c]onstruction of high-rise units during the past decade is pinpointed by [Riverdale] community leaders as their major objection to recent developments." Such opposition, of course, can only be expressed when the public is allowed to participate in the planning process. Thus it is only when a public agency, which is required to hold hearings on its projects, proposes a high-rise building that a community has an opportunity to express its opposition to such buildings.

11. We realize that Palmer v. Thompson, *supra*, suggests that courts generally should not inquire into motives in order to establish ra-

cial discrimination. However, we conclude from a reading of all the opinions in that case that it is doubtful that the Court intended to exclude from all consideration clear evidence of purposeful racial discrimination.

12. Contrary to the assertion of the dissent that the Faraday Wood project was designed to aid low-income persons, and as clearly evidenced by the high-income limit for project renters, the Mitchell-Lama Act was designed to correct "[t]he greatest single deficiency in the States urban centers [which is] the shortage of moderate income housing for families whose earnings exceed the traditional public housing level." Foreword to McKinney's Consolidated Laws of New York, Private Housing Finance Law, vii (1962) (statement of MacNeil Mitchell, Chairman, Joint Legislative Committee on Housing and Multiple Dwellings).

claim similar to one that plaintiffs make here. In Acevedo v. Nassau County, 500 F.2d 1078 (1974), we examined Acevedo's claim in light of the cases cited by plaintiffs in that case and we said:

> Appellants argue, however, that once appellees began to plan low income housing for Mitchell Field they could not, consistent with the Fourteenth Amendment, abandon the plan if to do so would have a disproportionate impact on minority groups, unless appellees could show a "compelling state interest" for that abandonment.
>
> . . .
>
> All of the cases on which appellants rely involve either the refusal of a governmental body to grant benefits equally to all or the governmental obstruction of private projects beneficial to minority groups or integration. Here appellants seek not to remove governmental obstacles to proposed housing but rather to impose on appellees an affirmative duty to construct housing. This is clearly not required by any provision of the Constitution.

Acevedo v. Nassau County, *supra*, at 1081.

Plaintiffs seek to distinguish *Acevedo* by noting that there was no private builder or sponsor involved in that case.[13] This seems irrelevant, especially since it probably only indicates that the Nassau County plans were more tentative than the plans here. In any event, the involvement of AMIH in the Faraday Wood project does not change the fact that the project was primarily a city project. The city initiated it, was intimately involved in its planning, and was going to finance it.

 We conclude that there is no fundamental right to a certain quality of

housing and that a project concerned primarily with middle-income persons does not deal with a suspect class. Hence the city's actions need not be justified by a compelling governmental interest. Those actions, in view of community opposition not shown to be racially motivated, more than satisfy the requirement of rationality, even if that be viewed with more than minimal vigor. Cf. note 5 supra. Thus here, as in *Acevedo*, there is no constitutional violation.

 Our decision today does not represent a retreat from *Lackawanna*. In that case we held that a city cannot take discriminatory action which impedes a private organizations' efforts to build housing for low-income families. Nor can a city build such housing itself and then operate it in a discriminatory manner. See Otero v. New York City Housing Authority, 484 F.2d 1122 (2d Cir. 1973). We hold today only that a city cannot be compelled to build and finance a specific housing project designated, in part, to aid low-income families or any specified group of its citizens simply because it started to plan such a project. As Justice Douglas said in Berman v. Parker, 348 U.S. 26, 33, 75 S.Ct. 98, 102, 99 L.Ed. 27 (1954): "We do not sit to determine whether a particular housing project is or is not desirable."[14]

## II.

Plaintiff AMIH also asserts a contract claim against the city. In AMIH's words, "This claim is based on the existence of an implied agreement that [the city] would process AMIH's application for Mitchell-Lama funding in good faith." Although plaintiff concedes that New York law governs this claim, it relies principally on federal cases that hold that the federal government has a duty

---

**13.** Our opinion in *Acevedo* made no mention of Acevedo's failure to show that Nassau County was segregated. The dissent's attempt to distinguish *Acevedo* on this ground seems strained.

**14.** The soundness of Justice Douglas's statement is seen in the dissent's uncertainty over what remedy would be appropriate in this case if its views were followed. Courts are

not equipped to choose housing sites, approve plans, sell bonds and oversee construction projects. Moreover, if we required the city to build this housing project, the city might be deterred from considering future projects for fear that if it indicated even a tentative interest in a project, the federal courts might later force it to build it, despite the city's financial condition or its other housing programs.

to consider honestly bids that it has solicited. See, e. g., Keco Industries, Inc. v. United States, 428 F.2d 1233, 192 Ct.Cl. 773 (1970); Heyer Products Co. v. United States, 140 F.Supp. 409, 135 Ct.Cl. 63 (1956).

■ However, even if we adopted the standards of these cases the plaintiffs have failed to show that the city acted in bad faith. AMIH knew that this proposal had to be approved by the New York City Board of Estimate before the parties could enter into a binding contract. The Board of Estimate is a political body so AMIH knew that it would consider expressions of opinion by members of the public. It seems to us that it is a proper exercise of discretion for HDA to terminate a project when it feels that the Board of Estimate is unlikely to approve it because of public protest and political considerations.

■ AMIH also claims that since the city invited it to sponsor the project and caused it to expend money to develop acceptable plans for the project, the city is estopped from denying AMIH's claim for sums expended in reliance on the city's actions. As far as municipalities are concerned, the New York courts have clearly rejected such a doctrine. Emerman v. City of New York, 34 A.D.2d 901, 312 N.Y.S.2d 288 (1970).[15]

Affirmed.

OAKES, Circuit Judge (dissenting):

The majority opinion proposes a double constitutional standard in housing cases—"strict" equal protection if a housing project contemplates a very high percentage of, or exclusively, low income units, and simple "rationality" if it includes a goodly percentage of middle income units—apparently on the theory that middle income housing is for white people and low income housing for non-

whites. As such the opinion carries with it its own abnegation of previous precedents of this and other courts and, with all respect, unrealistically overlooks the fact that this particular project, like many others, employed a mix of low and moderate income units primarily to make it more palatable to the local community. The opinion is, perhaps, another harbinger of a new supposedly benign judicial (on top of a firmly established executive) policy of laissez faire, and as such I do not quarrel with it philosophically here. Rather, I call attention here to it only as a departure from two decades of judicial activism in the area of restoring meaning to that provision of the United States Constitution calling for equal protection of the laws, recognizing, of course, that as now construed above that clause is deemed not to require protection of "poor" people as a class equal to that of "rich," even while it requires protection by the laws of nonwhite people equal to that of whites. Here by a strained differentiation of our prior case law, on the basis that this was 80 per cent middle income housing (even if originally intended to benefit primarily nonwhite, and therefore probably lower income, residents of the ghettos of the City of New York), that case law, so far as it gave constitutional protection in the housing area to those most needing it, has been pushed further back on the shelf.

It is by no means a confession that this dissent presupposes, I suppose, that housing is, if not a preferred or even fundamental "right," one of the most basic necessities, not just because it means a roof over the head of an American individual or of his or her family, but because it carries with it a bundle of consequences that deeply involve our daily lives as American citizens, as voters, as students, as learners, as job seekers.

---

15. Plaintiffs' reliance on Planet Construction Corp. v. Board of Educ., 7 N.Y.2d 381, 198 N.Y.S.2d 68, 165 N.E.2d 758 (1970), is misplaced. In that case the New York Court of Appeals merely held (4–3) that a board of education could itself take action with regard to a contract that it had entered into that

might estop it from asserting a particular provision of that contract. That is a far cry from holding that a governmental body can be held to a contract because of certain actions taken by its officials, when all parties involved knew that the officials had no power to enter into a binding contract.

It would be an oversimplification to say that a "right to housing" was not in the contemplation of our forebears, because anyone, by moving 100 miles more or less westerly could find his own homestead. One may suggest 200 years later, that such a right to shelter is "fundamental" when many people no matter what they try to do are confined to living in that part of a city where grocery prices and crime rates are highest, garbage is collected last, soft coal is still burned for fuel, windows are broken, schools are worst, medical care is least and jobs are a subway ride and an education away.

This dissent also presupposes that equal protection of the *laws* means those laws which subsidize, aid and foster a given social policy, not merely those laws which prohibit or penalize antisocial conduct. The fundamental question that this easy-to-gloss-over case deals with is whether there are any constitutional (and perforce court-enforced) remedies for local opposition for racial/social reasons to new housing opportunities (outside the ghetto) that would otherwise be made available by a city for its ghetto residents.

The factual setting of the present case has at the same time both a subtle and a stark side. The subtle side reflects a community's attempts to conceal its racially motivated negativism against housing for inner city residents, by use of the disguise of legitimate local concerns. The stark side is that there was in the defeat of the project here involved yet another victory for parochialism, helping perpetuate the formidable wall that serves to exclude the urban poor from the more affluent communities on the fringe of our metropolitan areas.[1]

This is the latest in a line of cases in which a private developer, seeking to build a low income housing project which makes use of governmental subsidies, is unable to secure the necessary governmental approval to permit the project to proceed. As background to this litigation is the sentiment, right or wrong, that at least partial solutions to many of urban America's problems may be found by breaking down metropolitan income-group clustering, with the poor concentrated in certain political subdivisions, the "central city."[2] Superior educational opportunities, the potential for better housing to be built on presently underutilized land, and an increasing number of jobs all appear to lie in areas—generally "suburbs"—beyond the reach of the urban poor. Coupled with this discrepancy is an understandable reluctance on the part of the low population density communities to grant easy access to their resources.[3] We have then a wall that presently exists between affluence and poverty—a wall which some have attempted to breach by litigation aimed at, *e.g.*, land use controls, or as here promoting low or low and middle income housing in what for want of a better generic name I will call the suburbs. Most of this litigation typically has raised, and certainly involved, claims under the equal protection clause both of racial discrimination and of wealth discrimination (although since San Antonio School District v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), the claims of wealth discrimination carry no weight). *E. g.*, Kennedy Park Homes Association v. City of Lackawanna, 436 F.2d 108 (2d Cir. 1970), cert. denied, 401 U.S. 1010, 91 S.Ct. 1256, 28 L.Ed.2d 546 (1971); Southern Alameda Spanish

---

1. The local community here involved, North Riverdale, is not a suburb but a part of New York City, with its own planning district.

2. *See generally* Haar & Iatridis, Housing the Poor in Suburbia (1974) (hereinafter cited as Haar); A. Downs, Opening Up the Suburbs: An Urban Strategy for America (1973); Branfman, Cohen & Trubek, Measuring the Invisible Wall: Land Use Controls and the Residential Patterns of the Poor, 82 Yale L.J. 483 (1973); Shields & Spector, Opening Up the Suburbs: Notes on a Movement for Social

Change, 2 Yale Rev.L. & Soc. Action 300 (1972). *But see* Glazer, On "Opening Up" the Suburbs, The Public Interest 89 (1974).

3. A November 5, 1974, advertisement for a town-sponsored "public service" television program put it very succinctly: "Is the onslaught of urban sprawl creeping eastward from New York City to Suffolk County? Does the mass of humanity threaten the serenity of suburban living as it was once enjoyed?" N.Y. Times, Nov. 5, 1974, at 61, cols. 7 & 8 (city ed.).

Speaking Organization v. City of Union City, 424 F.2d 291 (9th Cir. 1970).

The present decision undercuts the statement by this court in *Kennedy Park Homes*, a leading case in this area of the law, that

[e]ven were we to accept the City's allegation that any discrimination here resulted from thoughtlessness rather than a purposeful scheme, the City may not escape responsibility for placing its black citizens under a severe disadvantage which it cannot justify.

As such, it also runs contrary to more recent cases from other circuits such as United Farmworkers of Florida Housing Project, Inc. v. City of Delray Beach, 493 F.2d 799, 801 (5th Cir. 1974), Gautreaux v. Chicago Housing Authority, 503 F.2d 930 (7th Cir. 1974), and Joseph Skillken & Co. v. City of Toledo, 380 F.Supp. 228 (N.D.Ohio 1974), all of which recognize the importance of providing a judicial remedy in situations where community opposition to low income housing is predicated upon racial discrimination.[4] I would follow *Kennedy Park* in its view of the demands of the equal protection clause, even though I have a number of doubts, if not misgivings, as to the validity or value of the social hypothesis that the problems of minority groups concentrated in inner city areas can be remedied by diffusion, without creating other problems—such as weakening of political power—of considerable moment.

Concededly on this review we are not bound by the usual rules requiring us to give special weight to findings made by a district judge, since here his role was simply to read, as can we, the printed pages of a record already made. As such, the findings below that there was no racial motivation underlying the failure of the Housing and Development Administration (HDA) to submit the final proposal to the Board of Estimate,[5] and no racially discriminatory effect flowing therefrom, seem to me clearly erroneous.[6] I will discuss these findings first.

The project here in question originated as part of a program for scatter-site subsidized housing outside of inner city "ghettos," of which New York has its share. This was announced by then Mayor John Lindsay on March 16, 1966, doubtless as part of his program to keep the City "cool" in an era of national urban tension, but in any event so as to take advantage of, in the words of his press release, "underutilized areas in outlying sections of New York City."[7] The September, 1967, Newsletter of the Department of City Planning, announc-

4. *See also* Appeal of Kit-Mar Builders, Inc., 439 Pa. 466, 268 A.2d 765 (1970) (striking down lot size requirements); Appeal of Girsh, 437 Pa. 237, 263 A.2d 395 (1970) (exclusion of apartment buildings from community zoning plan was unreasonable). While neither of these cases involved proven racial discrimination, they express the need for a strict standard in reviewing local zoning plans which fail to take into account regional housing needs. *But see* United States v. City of Black Jack, 372 F.Supp. 319 (E.D.Mo.1974), rev'd & remanded 508 F.2d 1179 (8th Cir. 1974).

5. This is not a case where a plan was submitted to and rejected by the Board of Estimate or final approving authority. *Cf.* Acevedo v. Nassau County, 500 F.2d 1078, at 1081–1082 (2d Cir. 1974). To be sure, there is no guarantee that the Board of Estimate would have approved the Faraday Wood plan in any of its various phases, but absent a good faith submission to it we will never know. At the very least, it seems to me "best efforts" were required of the HDA. *See* Gautreaux v. Chicago Housing Authority, 436 F.2d 306 (7th

Cir. 1970), cert. denied, 402 U.S. 922, 91 S.Ct. 1378, 28 L.Ed.2d 661 (1971).

6. I agree with the majority that Palmer v. Thompson, 403 U.S. 217, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971), does not exclude inquiry into motives in a claim of racial discrimination. While there is language that it is the facial content or the effect of a law which must provide the proof of discrimination, *id.* at 225, 91 S.Ct. 1940, throughout the opinions in *Palmer*, there are constant references to the "meager" quality of the record then before the court. In the present case, the record is a substantial one, and while the proof of racial motivation is circumstantial, it is nonetheless persuasive to me.

7. The scatter-site housing program had the stated purpose of providing opportunity for "status advancement" of the residents of the City's ghettos. Proponents of "opening up the suburbs" set forth a number of reasons for dispersing racial groups, consisting of lower and middle income American citizens, throughout underutilized areas in the city or its suburbs, in addition to long cherished no-

ing *formal* designation of 11 sites including the one at bar, pointed out that the *object* of this phase of the City's housing program was *"to open housing opportunities in sound, predominantly white, middle-income neighborhoods for those now confined to the City's ghettos. . . ."* (Emphasis added.) The policy behind the program was stated quite simply: "[Y]ou cannot breach the walls of the ghetto if you only build within them." The majority opinion seems to me to ignore this stated purpose and thereby somehow seeks to make Faraday Wood into a housing project primarily for the benefit of middle income whites. It was, however, a project primarily for the benefit of low income nonwhite ghetto residents.

In examining the defeat of Faraday Wood, two facts are of special significance in determining whether it was racial discrimination that blocked the project. First, the site was located in the predominantly white North Riverdale section of the Bronx; in the 1960 census North Riverdale had a population of 12,376, of which 97.7 per cent were white, 2.0 per cent Negro and 0.3 per cent Puerto Rican. Second, it was community opposition to the concept of a low-middle income scatter-site housing development in Faraday Wood that resulted in its changes of form and ultimate demise. The original concept for the development called for a 300-unit project, with 150 units for low income and 150 for middle income citizens;[8] after strong community opposition at the August 2 and September 11, 1967, hearings the planning officials cut this back to a low income component of 20 to 30 per cent only.[9] Again, after continuing community opposition expressed emotionally at a May 7, 1968, hearing of the local planning board,[10] and expressed practically by the formation of the North Riverdale Civic Association in opposition to the project, the project was said in a mayor's press release, issued in the heat of a reelection campaign, to be dead. Subsequently it was locally proposed to rezone the Faraday Wood section to a lower density classification. At this point, the City cut out the low income component altogether, making the project, or what was left of it, 50 per cent middle income and 50 per cent elderly, and, after November, 1970, an all elderly one. While there is some dispute whether the then administrator of HDA told a representative of the National

tions of elementary social justice: to provide greater access to job opportunity; to provide an escape from the slums, with their high crime ratios and low housing standards; to furnish greater educational opportunity (and thereby incidentally, avoid the necessity of busing for educational equalization purposes); to redistribute the cost of combatting poverty and the social ills it helps effectuate; to halt the decay of the inner city; and to avoid a society that is divided if not polarized. *See* A. Downs, Opening Up the Suburbs: An Urban Strategy for America 115 (1973). It happens that the mayor's housing program, to the extent it contemplated the increase of housing choices and promotion of a more racially balanced community, furthered U.S. Department of Housing and Urban Development (HUD) policies. Title VIII, Civil Rights Act of 1968, Fair Housing Act, 42 U.S.C. § 3601, states that "It is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States." *See also* 42 U.S.C. § 3608; Otero v. New York City Housing Authority, 484 F.2d 1122, 1132–1134 (2d Cir. 1973). *See* Haar, *supra* at 319.

8. The New York Housing Authority's original plan called for 300 units. The original AMIH proposal, filed July 28, 1967, indicated a willingness to build 465 units with an equal mix of low and middle income units.

9. An HDA memo in evidence attributed the shelving of the original proposal to "opposition from the neighborhood to low-income housing . . .." At all times, it should be noted, the project did contemplate at least 10 per cent usage for elderly citizens.

10. Opposition at this meeting was on the basis of the threat of the project to existing property values, the overtaxing of community facilities and schools, and the possibility of increased crime. It is interesting that a City Planning official at the meeting stated, "Some of your community leaders have told me that there is local reluctance to face [the] issue [of providing "increased opportunity" for "status advancement" to "today's poor—mostly Negroes and Puerto Ricans"] in public discussion, that it may be hidden in a smokescreen of seemingly plausible objections." Statement of Barney Rabinow, Assistant Executive Director, Department of City Planning, May 7, 1968 (Plaintiffs' Ex. 6).

Committee Against Discrimination in Housing (NCDH) that he agreed "that the racial issue was a fundamental issue, a very important issue in the Riverdale area . . . ,"[11] there is no doubt but that it was community opposition to this scatter-site project that killed it.

As in most of these cases, to grasp the true nature of the opposition, it is necessary to examine the validity of the objections actually voiced, to determine whether they were rational and plausible or only superficially valid and used, consciously or unconsciously, to mask discrimination. *Cf.* Olzman v. Lake Hills Swim Club, Inc., 495 F.2d 1333 (2d Cir. 1974). The justifications for opposition as expressed by the district court were "rapid population growth and subsequent overtaxing of community facilities" and "the expanding number of high-rise apartment buildings." But there was no evidence adduced in this record to support those concerns; on the contrary, the Faraday Wood site was considered by all the public officials testifying at trial as most appropriate. As to overburdening schools, there was every indication that construction of the already approved and budgeted John F. Kennedy Educational Center in Riverdale would resolve all classroom needs for years to come; the project developer, moreover, offered to provide 7,000 square feet of extra classroom space pending completion, to avoid any temporary problems. Parking objections were taken care of by incorporating an underground garage large enough to handle one car per dwelling unit. Recreational area objections were adequately responded to by opening up to community use seven of the eight acres on the site. No showing whatsoever was made of any adverse effect on transportation facilities or police, fire or hospital services; indeed the only evidence in the record was that all of these were in abundance in a community which was

considered "among the most if not the most privileged community in the city" according to a City Planning Committee executive.[12] As for the "high-rise" objection, not only was the project designed to be built on only one out of eight acres, with the high-rise structure back from and shielded from the street, but many other apartment buildings (not for low income) had been built, including high-rises. *No zoning exception* was needed for the project. Finally, 1971 city rezoning left Faraday Wood for future apartment construction and, interestingly, the U.S.S.R. Mission to the United Nations, which ultimately acquired the site in question, is in fact building a large high-rise apartment structure *without* community opposition. *See* New York Times, Jan. 13, 1974, § 8, at 1 (city ed.). All of the evidence to my mind supports the proposition that the reasons advanced to oppose scatter-site housing at Faraday Wood were invalid and only a cover for discrimination.

Even if my interpretation of these facts were incorrect, however, at the very least there was a racially discriminatory *effect.* The district court relied heavily on, and Judge Lumbard's opinion reemphasizes, the allegation that "the determination did not have an unconstitutional racially discriminatory effect because 80% of the units in the project were reserved for middle income families and thus the brunt of the project's termination was borne by those families."[13] I would not accept the allegation in any event, since originally the project was designed for 50 per cent or 150 low income families. But even accepting that allegation, what about the 20 per cent of 300, *i. e.,* 60 families left in the inner city? If as is likely the mix of low and middle income families was changed so as to make the project more palatable to the North Riverdale community, nevertheless the rejection of the project still

---

11. The HDA administrator, Albert Walsh, said that he told the NCDH official that he "believed that [he] had been able or would be able . . . to isolate [racial prejudice] from the responsible majority of the community . . . ."

12. He did except hospital services *if* the development were exclusively for the elderly.

13. In fairness to Judge Ward, however, he said "70–80%." 362 F.Supp. at 656.

adversely affected a number of ghetto residents. Are we to have two different constitutional rules, as the majority opinion suggests, depending on the housing mix? In any event, I believe we have a different factual case from the one conceived by the district judge and ruled on by the majority.

In measuring effect, it seems to me, it has to be remembered, as the majority has not done, that the Faraday Wood project was part of a program which was in the nature of affirmative action to remedy the effects of past discrimination. To say that a decision to terminate the project has no racially discriminatory effect is to disregard the reason that the scatter-site housing plan was adopted in the first instance—a reason that was declared in advance by the City itself.

The *sole* reason for the Faraday Wood project was to provide decent housing for the inner city poor who were presently said to be residing in the New York ghettos. Middle income units were included because the trend in such developments was, for a number of reasons, to mix low and middle income units.[14] Such mixed projects have proven to be more successful than those including only low income housing. The majority opinion fails to recognize these facts, and in doing so neutralizes the primary effect of the decision to terminate the Faraday Wood project, which was an effect on the inner city poor, primarily members of minority groups.

As I read the majority opinion, it relies principally on four cases to sustain its position that there need be no show-ing of a "compelling state interest" for abandonment of the project: Lindsey v. Normet, 405 U.S. 56, 74, 92 S.Ct. 862, 31 L.Ed.2d 36 (1972); Palmer v. Thompson, 403 U.S. 217, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971); Village of Belle Terre v. Boraas, 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974), and Acevedo v. Nassau County, 500 F.2d 1078 at 1082 (2d Cir.1974).[15]

Lindsey v. Normet contains language to the effect that there is no constitutionally protected right to a certain quality of housing, but the case does not involve racially discriminatory site selection (or non-selection). Lindsey v. Normet, moreover, is essentially a case dealing with procedural due process relating to a state Forcible Entry and Wrongful Detention statute, rather than the equal protection claim here.

Likewise inapposite is Palmer v. Thompson which held that a city could not be forced to continue to operate recreational facilities, regardless of its motivation in closing them. The opinions in *Palmer* are replete with references to the fact that the case was dealing with non-essential recreational facilities—Mr. Justice Blackmun referred to them in his concurring opinion as "nice-to-have but not essential." 403 U.S. at 229, 91 S.Ct. at 1947. The present case involves a clear necessity, housing, and a duty of the City of New York, recognized by the City, to provide solutions to the problems of segregated housing. As this court said in Otero v. New York City Housing Authority, 484 F.2d at 1133, "the Authority is under an obligation [both con-

---

**14.** The September, 1967, Newsletter of the Department of City Planning which proposed the scatter-site plan indicates that almost all of the contemplated projects involved mixing income groups. One of the reasons for doing this was to promote greater community acceptance of the project.

**15.** The majority also mentions at n. 5 San Antonio School District v. Rodriquez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), but the present case does not involve a claim of discriminatory treatment brought about by suspect wealth classifications. The majority does not rely, as did Judge Ward, 362 F.Supp.

at 658, on James v. Valtierra, 402 U.S. 137, 91 S.Ct. 1331, 28 L.Ed.2d 678 (1971); until better advised I will continue to consider *Valtierra* as being primarily based on the sanctity of a referendum. *See* dissent in English v. Town of Huntington, 2 Cir., 448 F.2d 319, 324, 327 n. 5 (1971). Other courts have taken the narrow view of Valtierra. *E. g.,* Gautreaux v. City of Chicago, 480 F.2d 210 (7th Cir. 1973); Sisters of Providence of St. Mary of the Woods v. City of Evanston, 335 F.Supp. 396, 403 (N.D.Ill.1971). *See also* Note, The Equal Protection Clause and Exclusionary Zoning After Valtierra *and* Dandridge, 81 Yale L.J. 61 (1971).

stitutional and statutory] *to act affirmatively* to achieve integration in housing." [16] (Emphasis added.)

Village of Belle Terre v. Boraas, while it contains some rather broad language in a zoning context regarding the preservation of environmental amenities against the onslaught of nonfamilial lifestyles, surely does not support an abandonment of the "strict scrutiny" test in a racial discrimination case; *Belle Terre*, moreover, concerned a tiny village, one square mile in area and containing only a few hundred residents, as compared to North Riverdale's many times larger population and area.

I come finally then to *Acevedo* and I am troubled by it because it is not so easy to distinguish as appellants would make out; their suggestion that this case involves governmental obstruction of private efforts while *Acevedo* held only that Nassau County had no affirmative duty to build low-cost family housing at Mitchell Field I find not altogether convincing. There was, however, no showing in *Acevedo* that housing in Nassau County was racially segregated de jure or de facto.[17] Assuming that the *Acevedo* panel did not intend to overrule

*Kennedy Park Homes* sub silentio, one must assume that it was reluctant to impose an affirmative duty to construct low income housing on a community not demonstrably segregated or with a history, too long and too well developed to reconstruct, of concentrations of minority groups in the central city. Here, however, we have the City of New York and we are talking about integrated housing—albeit on a tiny scale—in one limited area. As such, in principle, there is no difference between this case and *Kennedy Park*; there may be more bridges out of Harlem than the one out of Lackawanna's ghetto, mentioned in the majority opinion here, but the ability of nonwhite population concentrations in the City of New York to cross the river to social justice [18] is none the greater.

In terms of relief, at this late date and on the record before us it is hard to know whether an alternative site in Riverdale is available for possible construction of a comparable project, or whether any of the plans developed by appellant AMIH would be useful at such a site. These would obviously be matters for the district court to consider upon remand.[19]

16. Judge Mansfield's opinion went on to say that "Not only may such [discriminatory] practices be enjoined, but affirmative action to erase the effects of past discrimination and desegregate housing patterns may be ordered." 484 F.2d at 1133. And *see* Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 18, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); Griggs v. Duke Power Co., 401 U.S. 424, 431–432, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); Associated General Contractors v. Altshuler, 490 F.2d 9 (1st Cir. 1973), cert. denied, 416 U.S. 957, 94 S.Ct. 1971, 40 L.Ed.2d 307 (1974). Norwalk CORE v. Norwalk Redevelopment Agency, 395 F.2d 920 (2d Cir. 1968) is with *Otero* the other leading Second Circuit case requiring affirmative action to provide more housing for nonwhites. The South had to face up to these problems almost two decades ago. Heyward v. Public Housing Administration, 238 F.2d 689 (5th Cir. 1956).

17. The district court in *Acevedo* specifically found that "The evidence before the court does not disclose the existence of *fixed* patterns of home ownership in Nassau County." 369 F.Supp. at 1390. Additionally, in *Aceve-*

*do*, the housing project in question was to be built in an area "in close proximity to other areas populated by significant numbers of Blacks." *Id.* In *Acevedo* there was no duty conceded by the County, as there was here promulgated by the City, to build low income housing.

18. This is not to say, of course, that Harlem, or Spanish Harlem, is New York's only nonwhite ghetto area.

19. The relief requested points up the problems which face any court attempting to counteract the effects of exclusionary housing practices and suggests that a legislative solution to this problem would very likely be superior to a court directed plan for integrated housing. *See, e. g.*, Mass.Gen.Laws Ann. ch. 40B §§ 20–23 (Supp.1973) (which provides for a state level agency with the power to override local community objections to the construction of low income housing); Note, The Massachusetts Zoning Appeals Law: First Breach in the Exclusionary Wall, 54 B.U.L.Rev. 37 (1974). The fact that the legislature might be able to provide a broader or

At the very least there remains, however, what to my mind is a valid claim for damages, one which is supported on contractual grounds alone. *See* Restatement of Contracts § 90; Keco Industries, Inc. v. United States, 428 F.2d 1233, 1237, 192 Ct.Cl. 773 (1970). *See* Knapp, Enforcing the Contract to Bargain, 44 N.Y.U.L.Rev. 673, 688–90 (1969). Appellant AMIH states that over $200,000 was invested in attempting to produce and in revising a project which was never submitted to the Board of Estimate for reasons which I believe can be treated as amounting to bad faith. As such, some relief, even under New York law and our pendent jurisdiction, should be available. *Cf.* Planet Construction Corp. v. Board of Education, 7 N.Y.2d 381, 198 N.Y.S.2d 68, 165 N.E.2d 758 (1970).

I would, then, reverse and remand.

better remedy than the courts in no way takes away from the compelling nature of the proposition that *somebody* act, a proposition that I believe is demanded by the application of the equal protection clause in this situation. The *Kennedy Park Homes* and *Otero* courts, and those in the cases in the text above accompanying footnote 4 of this dissent, have not been unaware that enforcement of the equal protection clause sometimes has the result of making the courts active in areas where a history of not always benign neglect has resulted in local racial discrimination.