**108**

KENNEDY PARK HOMES ASSOCIATION, Inc.; Colored People's Civic and Political Organization, Inc.; James M. Thomas; Samuel Martin; the Diocese of Buffalo, New York, Plaintiffs-Appellees,

United States of America, Plaintiff-Intervenor-Appellee,

v.

CITY OF LACKAWANNA, NEW YORK, Mark L. Balen, as Mayor, Michael T. DePasquale, Melvin D. Wodzinski, Frank Amrozowicz, Edward L. Piotrowski, and Thadeus Sroda, as constituting the City Council, Frank D. Cipriani, as Director of Development, Edward J. Kuwick, as Chief Engineer, Defendants-Appellants.

No. 359, Docket 35320.

United States Court of Appeals, Second Circuit.

Argued Oct. 14, 1970.

Decided Dec. 7, 1970.

Certiorari Denied April 5, 1971.
See 91 S.Ct. 1256.

Michael Davidson, New York City (Jack Greenberg, New York City, and Will Gibson, Buffalo, N. Y., on the brief), for appellees.

Charles S. Desmond, Buffalo, N. Y. (Kevin Kennedy, Buffalo, N. Y., on the brief), for appellee Diocese.

Alexander C. Ross, Atty., Dept. of Justice, Washington, D. C. (Frank E. Schwelb, Atty., Dept. of Justice, H. Kenneth Schroeder, Jr., U. S. Atty., W. D. N. Y., Jerris Leonard, Asst. Atty. Gen.), for plaintiff-intervenor-appellee.

Grace Marie Ange, Buffalo, N. Y. (Condon, Klocke, Ange & Gervase, Buffalo, N. Y., on the brief), for appellants.

Robert L. Carter, Richard F. Bellman and Sol Rabkin, New York City, for the National Committee Against Discrimination in Housing, Inc., and the National Urban Coalition, as amicus curiae.

Before CLARK, Associate Justice,* LUMBARD, Chief Judge, and KAUFMAN, Circuit Judge.

CLARK, Justice, Retired:

This is an appeal from a judgment of the United States District Court for the Western District of New York, Curtin, J., requiring the City of Lackawanna to take all necessary steps to allow Kennedy Park Subdivision to proceed with its construction plans for the development of a low income housing project on a certain tract of land, together with the supporting orders necessary thereto. The suit was commenced by the Kennedy Park Homes Association, the Colored People's Civic and Political Organization (C.P.C.P.O.), a membership corporation interested in housing, the Diocese of Buffalo, New York, and individual home seekers. The defendants included the City of Lackawanna, its City Council and Mayor as well as other city officials. The United States of America was permitted to intervene. The complaint alleged that the defendants had deliberately rezoned the property that the plaintiffs had selected for its housing project as a park and recreation area, and had declared a moratorium on new subdivisions, in order to deny decent housing to low-income and minority families, in violation of the Equal Protection and Due Process Clauses of the Fourteenth Amendment to the Federal Constitution, the Civil Rights Act (42 U.S.C. § 1983) and the Fair Housing Act of 1968 (42 U.S.C. § 3601 et seq.). After an extended trial the Court entered its decision and order on August 13, 1970, 318 F. Supp. 669. Thereafter this court on September 3, 1970, granted a stay of the order conditioned on accelerated briefing and argument. We affirm the judgment and refer appellant Lackawanna's application for modification to the trial judge for such action as is warranted under the premises.

At the outset we point out that the comprehensive and well-documented decision and order of the learned trial judge has been most helpful to us in our consideration of the case. While the defendants-appellants attack the findings as being based on inference and implication, we find after careful study that they are fully supported by the record and lead inescapably to the conclusion that racial motivation resulting in invidious discrimination guided the actions of the City. The pattern is an old one and exists in many of our communities but

---

* United States Supreme Court, retired, sitting by designation.

appears to be somewhat more subtle in Lackawanna. However, when the chronology of events is considered, the discrimination is clear.

## I.

First, we have a three-ward city with 98.9 percent of all of its nonwhite citizens living in the First Ward. The Second Ward, with a population of 8,974, has only one nonwhite person, while only 29 nonwhites reside in the Third Ward. The Bethlehem Steel Company's plant, with its more than 20,000 employees, occupies at least half of the land area of the First Ward. This Ward also has the oldest, most dilapidated dwelling houses, and the highest residential density with the greatest percentage of persons per unit in the city. Health-wise it is classified as a "high risk area," having double the incidence of tuberculosis and the highest infant mortality rate of the entire city. Its juvenile crime rate is three times the city average, and its adult crime rate is double the average. The air pollution from the steel plant is at times unbearable because of the huge clouds of smoke, 'the dust and particles spewing from its furnaces and the open hearths that burn constantly. To add insult to injury, a series of parallel railroad tracks serves the steel mill, running along the east boundary of the First Ward and physically separating it from the rest of the City. Indeed the only traffic connection between the two is a single bridge that spans the railroad tracks at Ridge Road. This man made and City approved physical barrier actually segregates the black community of Lackawanna, located in the First Ward, from the rest of the City. The tracks are often tagged as the barrier "between the 'haves' and the 'have nots.' "

Second, the nonwhite residents of Lackawanna make up one-tenth of its population and 35.4 percent of the First Ward. The Planning and Development Board of Lackawanna has seven members, all of whom are white and none of whom reside in the First Ward. Each Ward has one councilman and two are elected at large but the First Ward has only one member of the Council. There are three low income housing projects in the City of Lackawanna. All of them are in the First Ward. The best housing in the First Ward, the Bethlehem Park project built by the Steel Company, was restricted to whites until recently.

Third, although many of the blacks residing in the First Ward wish to move out of it, building contractors generally will not build a house for a black citizen in the Third Ward. As the Planning Consultant to the City expressed it to the Planning and Development Board as late as February 1968:

"The Negro has indicated tremendous concern about his suspected confinement to the first ward. At almost every one of the Planning Board meetings, collectively they have stated they do not feel that any residential use should be allowed to remain in the first ward. In piercing through what they say, what they really mean is don't keep us in the first ward, let us live where our income or our desires allow us. You have a tremendous pressure building up in your community on the part of the non-whites to go across the bridge."

In fact, only the month before representatives of the C.P.C.P.O. had called on the Director of Development of the City to inquire about the availability of city-owned land for subdivision development. Subsequently one of the plaintiffs in this case offered to buy 74 contiguous lots in the Second Ward for a housing development but his offer was tabled by the City Council. Although a group of ministers urged the Mayor to permit the sale, he told them informally that any sale of city property might have to be by public bid but that he would look into it. He never replied to their inquiry. Neither the Mayor nor the Director of Development made further reply.

In March 1968 arrangements were made with the Diocese of Buffalo by plaintiff C.P.C.P.O. to purchase 30 acres of the Diocese land in the Third Ward

to be used for a proposed Kennedy Park Subdivision, a low income housing project. The site was located south of Martin Road and east of the proposed route of the "McKinley Extension" highway. C.P.C.P.O. incorporated the Kennedy Park Homes Association as a housing or mortgagor company. This news was reported in the Buffalo and Lackawanna press. Petitions were circulated opposing the sale. One petition with 3,000 signatures was sent to Bishop McNulty of the Diocese opposing the sale for lack of sewer facilities and schools. It carried the name of both Mayor Balen and the President of the City Council. A meeting in the Third Ward also opposed the sale, and a group known as TICA (Taxpayers Interested in Civic Affairs) was a leader in opposition. In April 1968, at a meeting of the TICA group, concern was voiced over both the sewage problem and the schools as well as the damage that might result to property values if low income housing was constructed in the Third Ward. In addition some fears of increased unrest and misunderstanding were expressed if "a grand scale integration" rather than "the gradual way" resulted. At a later First Ward group meeting a report was made of this earlier meeting in the Third Ward. A spokesman for the First Ward group made reference to "rumored threats of violent action" if moves from the First to the Third Ward were made and indicated the Justice Department and Attorney General's Office had been alerted. A joint meeting was suggested but was never held. Both of these meetings in the Third and First Wards, respectively, were held under the auspices of the Commissioner of the New York State Human Rights Division and the Chairman of the Lackawanna Human Rights Commission.

Although plans were being studied for housing and sewerage improvements beginning in 1967, none had been adopted. On August 20, 1968, the Lackawanna Zoning Board of Appeals and the Planning and Development Board met in joint session and recommended to the City Council a moratorium on all new subdivisions until such time as the sewer problem was solved. It also recommended that parts of the Second and Third Wards be designated for open space and park area. This area included the land to be devoted to the proposed Kennedy Park Subdivision. Thereafter on October 7, 1968, the City Council adopted both a moratorium and zoning ordinance along the line recommended by the Zoning Board of Appeals and the Planning and Development Board, but the area encompassed by the zoning ordinance was more limited to the immediate area surrounding the Kennedy Park site.

This suit was filed soon thereafter. On February 26, 1969, after the United States had intervened, both ordinances were rescinded. Subsequently the subdivision requested permission to tie into the City sewer system. Before the Erie County Health Department will consider such requests, it must receive a "Sanitary Form 5," which is an application by the City on behalf of a subdivider to approve the sewer extension. The Mayor refused to sign this form. Without the sewer permit, the black citizens were unable to proceed with their project.

## II.

There are some preliminary matters that we should first decide. Lackawanna filed a motion in the District Court for judgment on the pleadings. It was based on two grounds, i. e., the plaintiffs had not stated a claim upon which relief might be granted, and the case was rendered moot when Lackawanna rescinded the Zoning Ordinance restricting the use of the land in question as well as the Resolution declaring a moratorium on new subdivisions.

The argument is that plaintiffs have failed to show that Kennedy Park Homes Association is capable of building the subdivision, and that they therefore lack standing. Assuming but not deciding that such a showing is necessary, it appears clear that the Association has

met the test. The trial court held, and we think properly, that "all Plaintiffs have a personal stake in the outcome of the controversy." The record shows that the Association has a "commitment" from the Diocese for the purchase of the site; the Federal Housing Administration has initially approved its application for federal financial assistance; a professional housing consultant has been engaged and the services of an engineer obtained. As soon as the Mayor certifies the necessary sewerage form, the consummation of the project could be effected. We cannot permit Lackawanna to deprive the plaintiffs of standing by the refusal of its Mayor to sign the form. The Association has proven that it has a high stake in the litigation which it has instituted in order to provide the blacks in Lackawanna with sufficient housing facilities. Norwalk CORE v. Norwalk Redevelopment Agency, 395 F.2d 920, 927 (2d Cir. 1968).

As to the claim of mootness, it is noted that the repeal of the Ordinance and Resolution occurred after this suit was filed. Courts do not favor actions designed to stymie litigation, particularly where the public interest is so deeply involved and is of the highest priority. United States v. W. T. Grant Company, 345 U.S. 629, 632, 73 S.Ct. 894, 97 L.Ed. 1303 (1953). Furthermore Lackawanna still blocks the development, since the repeal of the Ordinance and Resolution was followed by the Mayor's refusal to approve the Association's application to tie onto Lackawanna's sewer line. His continued refusal is the real and presently existing obstruction.

A related contention suggests that the plaintiffs should be required to litigate the controversy in a state court. However, "Congress [has] imposed the duty on all levels of the federal judiciary to give due respect to a suitor's choice of a federal forum for the hearing and decision of his federal constitutional claims." Zwickler v. Koota, 389 U.S. 241, 248, 88 S.Ct. 391, 395, 19 L.Ed.2d 444 (1967). We see no sound reason in this case, in which the plaintiffs allege racially discriminatory action by city officials, to justify denying to plaintiffs their federal forum.

### III.

The main thrust of Lackawanna's attack on the judgment here is that the finding of discrimination is not supported by the evidence. Lackawanna does not quarrel with the correctness of the district court's view that its action must be assessed not only in its immediate objective but its historical context and ultimate effect. Lackawanna does "take exception to the conclusions it [the Court] draws from the facts proven." However, Rule 52(a) of the Federal Rules of Civil Procedure does not permit us to set aside findings unless they are "clearly erroneous," giving due regard to the opportunity of the trial court to judge the credibility of the witnesses. See Allstate Insurance Company v. Aetna Casualty & Surety Company, 326 F.2d 871, 874 (2d Cir. 1964). The trial judge here devoted 22 days to the trial. He listened to and observed the witnesses, read and studied the various exhibits, and he was fully informed as to the atmosphere in which the parties acted. The conclusions or findings "as to the design, motive and intent with which men act depend peculiarly upon the credibility given the witnesses by those who see and hear them." United States v. Yellow Cab Company, 338 U.S. 338, 341, 70 S.Ct. 177, 179, 94 L.Ed. 150 (1949). This factor is more significant where the state action under inquiry is insidious and subtle rather than direct and open. While it "would be our duty to correct clear error, even in findings of fact," id. at 342, 70 S.Ct. at 179, we cannot do so where the findings have substantial support in the record. Our examination of the record reveals substantial support for the findings here.

As the Supreme Court said in Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961): "Only by sifting facts and weighing circumstances" on a case by

case basis can the "non-obvious involvement of the State in private conduct be attributed its true significance." An analysis of Supreme Court cases in this area indicates the relevant considerations and approach. In *Wilmington Parking Authority, supra,* at 725, 81 S. Ct. 861, the Court found Delaware to be involved in private discrimination because it had "elected to place its power, property and prestige behind the admitted discrimination" and by its inaction had made itself a party to the discriminatory act. And in Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967), the Court approved the action of the Supreme Court of California in striking down Section 26 of Article I of the California Constitution because it involved the State in racial discrimination in the housing market. This conclusion was reached by consideration of the Section's immediate objective, ultimate effect and existing conditions at the time of its adoption.

These two decisions completely undercut Lackawanna's claims here. The mosaic of Lackawanna's discrimination is a sad one. First, the long standing, man-made, physically segregated First Ward of the City; then the long history of containment of 98.9 percent of the blacks of the whole city in the First Ward and their unsuccessful effort to escape it; and reaching into the present, the threats of violence that were made against the blacks when the proposed Kennedy Park subdivision was first publicly announced; the petitions circulated and signed against the subdivision and especially the one sent to Bishop McNulty of the Diocese containing 3,000 names; the action of the Planning and Development Board of the City in reversing its predecessor and recommending additional residential use of the land in the First Ward which already had the highest residential density in the City, despite the tremendous pressure that had built up among blacks to "go across the bridge";[1] the joint recommendation of the Planning and Development Board and the Zoning Board of Appeals to the City Council that it adopt a moratorium on new subdivisions and zone certain acreage, including the Kennedy Park subdivision site, as open space and park area despite the contrary recommendations of its planning expert; and the action of the City Council on such recommendations and on the sewerage moratorium. Indeed, the Council included two false grounds supporting the enactment of the ordinance, viz., that the National Recreation and Park Association study had recommended the zoning of the area included in the ordinance and that the City's Master Plan likewise earmarked the zoned area as recreation area. In fact, the National Recreation and Park Association study did not include the site of the Kennedy Park subdivision in its recommendation for zoning as public park property. The Association had recommended a 40-50 acre community park west of the proposed McKinley extension, whereas the Kennedy Park site was to the east. The Planning Consultant concurred in this recommendation. City officials never asked either the Consultant or the Association to consider the east area as a park. On the contrary, prior to the news of the agreement to purchase the Kennedy Park site, the Planning and Development Board thought that the open space designated for a park west of Martin Road was more than adequate. Both the original and subsequent Master Plans earmarked acreage which included the site of the

---

1. The Planning Consultant repeatedly urged the Board to restrict residential use in the First Ward, and not to use the area north of Ridge Road for residential purposes. He pointed out that this area had the worst pollution and delapidated housing, that private developers would probably refuse to build there, that financing would be difficult, and that the residents would not receive the proper services. Nevertheless, the Board on August 20, 1968 adopted a resolution setting aside part of this area north of Ridge Road for residential use, preferably apartments, although they disapproved of apartments in virtually every other area of the City.

Kennedy Park subdivision for residential purposes. The final element in this discriminatory pattern is the Mayor's refusal to approve the sewer application following repeal of both ordinances.

This panoply of events indicates state action amounting to specific authorization and continuous encouragement of racial discrimination, if not almost complete racial segregation.

■ These drastic measures are not justified under the authority of Lackawanna in the exercise of its power to preserve the "only" available land left in the City for park and recreation purposes, and to prevent a critical health problem from developing on account of inadequate sewage facilities. The plaintiffs sought to exercise their constitutional right of "freedom from discrimination by the States in the enjoyment of property rights." Shelley v. Kraemer, 334 U.S. 1, 20, 68 S.Ct. 836, 845, 92 L. Ed. 1161 (1948). The effect of Lackawanna's action was inescapably adverse to the enjoyment of this right. In such circumstances the City must show a compelling governmental interest in order to overcome a finding of unconstitutionality. Shapiro v. Thompson, 394 U. S. 618, 634, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). The City has failed to demonstrate an interest so compelling. None of the planning experts had recommended that the acreage included in the ordinance be unavailable for residential use. Nor did either of the Master Plans so specify. As noted above, the record shows that among other areas recommended there was a 40-50 acre community park and recreation center with ice skating and swimming facilities south of Martin Road and west of the proposed McKinley extension. The Kennedy Park site is east of this property and was not included within it.[2]

With reference to the sewerage problem, the record shows that the sewer system is and has been for years grossly deficient; still Lackawanna has done nothing about it. On the contrary, it has deliberately permitted the problem to worsen. It has allowed at least nine subdivisions with some 450 homes in the Third Ward to tie into its sewer system. Consequently, the population of the Third Ward has greatly increased, producing a condition of open sewage. Only once (1967) has there been a moratorium on all sewerage connections and it ended within fewer than 100 days. Lackawanna should have corrected its system long ago. The City chemist has recommended the installation of storm and sanitary sewers, the elimination of roof leaders, the televising of certain lines to detect obstructions, and the construction of a 24-inch additional sewer line. Lackawanna has not acted on any of these suggestions nor attempted to secure federal or state assistance with regard thereto. In the meanwhile their plea has been lack of money, which they now invoke to justify refusing to extend necessary sewer service to Kennedy Park. Lackawanna is obligated to deal with its sewer needs without infringing on plaintiffs' rights. Even were we to accept the City's allegation that any discrimination here resulted from thoughtlessness rather than a purposeful scheme, the City may not escape responsibility for placing its black citizens under a severe disadvantage which it cannot justify. Norwalk CORE, supra; Southern Alameda Spanish Speaking Organization v. City of Union City, California, 424 F.2d 291 (9th Cir. 1970). The City must provide sewerage facilities to the plaintiffs in conformity with the Equal Protection Clause of the Fourteenth Amendment and provide it as soon as it does for any other applicant. Oyama v. California, 332 U.S. 633, 68 S.Ct. 269, 92 L.Ed. 249 (1948). The particular manner in which this is done is for the District Court.

---

2. The City now claims that the site of the proposed McKinley extension was uncertain, and therefore the entire area south of Martin Road had to be held for possible use as a park. This is an after-thought, appears never to have been considered by City officials, and asks us to assume that the highway officials would not cooperate. We consider this claim devoid of merit.

We reiterate what was said over fifty years ago by Mr. Justice Day for a unanimous Court in Buchanan v. Warley, 245 U.S. 60, 80–81, 38 S.Ct. 16, 20, 62 L.Ed. 149 (1917):

"That there exists a serious and difficult problem arising from a feeling of race hostility which the law is powerless to control, and to which it must give a measure of consideration, may be freely admitted. But its solution cannot be promoted by depriving citizens of their constitutional rights and privileges."

We have examined the other claims of defendants-appellants and find them without merit. The judgment appealed from is affirmed.