Suffolk Housing Services et al., Appellants, v Town of Brookhaven et al., Respondents.

Second Department, July 8, 1985

### APPEARANCES OF COUNSEL

*Steel & Bellman, P. C. (Richard F. Bellman* and *Lewis M. Steel* of counsel), *Thomas I. Atkins* and *Margrett Ford,* National Association for the Advancement of Colored People, and *Lawrence Sager* and *Arthur Eisenberg,* New York Civil Liberties Union, for appellants. (One brief filed.)

*Martin Kerins, Town Attorney (Arden H. Rathkopf* of counsel), for respondents.

### OPINION OF THE COURT

Per Curiam.

On this appeal, we are called upon to consider two issues: first, whether the doctrine articulated by the Court of Appeals in *Berenson v Town of New Castle* (38 NY2d 102) imposes a duty upon a municipality to exercise its zoning powers in order to facilitate the development of low-to-moderate-income or low-cost housing, and, second, whether the actions taken by the defendant town with regard to various applications to develop Federally subsidized multiple-family housing for low-to-moderate-income families violated the Federal Fair Housing Act (42 USC § 3601 *et seq.*). For the reasons which follow, we answer both questions in the negative.

The plaintiffs in this action are organizations concerned with low-to-moderate-income housing and racial integration in the Town of Brookhaven and in Suffolk County, low-to-moderate-income and minority residents of the Town of Brookhaven and other towns located in western Suffolk County, and Brookhaven town taxpayers. In their complaint they alleged, *inter alia,* that the town, through its zoning ordinance, policies and practices, had prevented the development of sufficient housing to accommodate its steadily increasing low-to-moderate-income population by (1) failing to premap land for multifamily use (rather than permitting such usage by special permit only); (2) imposing excessive minimum acreage requirements for single-family homes; (3) rejecting applications for rezoning for multifamily use; (4) requiring developers of multifamily housing to enter into covenants restricting the number of multibedroom units; (5) imposing excessive site-area requirements for additional bedrooms in multifamily housing; and (6) obstructing the development of mobile home communities within the defendant town. They also alleged that the foregoing restrictions had a disproportionate adverse impact upon the minority residents of the town. In addition, it was alleged, *inter alia,* that the town had opposed the development of low-to-moderate-income and low-cost housing, by (1) refusing to establish a public housing authority, (2) refusing to cooperate with private efforts to develop such housing within the defendant town, and (3) refusing to apply for Federally funded community development block grants. Plaintiffs further contended that the town had failed to exercise its zoning powers to promote the general welfare as required by Town Law §§ 261 and 263; had deprived the plaintiffs of the equal protection of the laws as secured by NY Constitution, article I, § 11; had failed to zone in accordance with a master plan designed to promote the general welfare as required by Town Law § 272-a; and had deprived the plaintiffs of their rights under the US Constitution, 13th and 14th Amendments, as well as under the applicable provisions of the United States Code (42 USC §§ 1981-1983, 3601 *et seq.*). In their prayer for relief, they asked that the court declare the Town of Brookhaven's zoning ordinance and land use map to be null and void; to enjoin the town's allegedly improper zoning practices; and to order the town to act affirmatively to facilitate the development of low-to-moderate-income and low-cost housing within its geographical area. Trial Term, after a nonjury trial, rejected the plaintiffs' contentions in their entirety and they now appeal. We affirm.

Plaintiffs' primary contention on this appeal concerns the constitutionality of the Town of Brookhaven's zoning ordinance,

an issue which is largely controlled by the Court of Appeals decision in *Berenson v Town of New Castle* (38 NY2d 102, *supra*). In that case, the court, in addressing the constitutionality of a zoning ordinance which, unlike the present one, *totally excluded* new multifamily housing from the defendant town, set forth the following applicable standard of review (*Berenson v Town of New Castle, supra,* pp 109-111):

"In determining the validity of an ordinance excluding multifamily housing as a permitted use, we must consider the general purposes which the concept of zoning seeks to serve. The primary goal of a zoning ordinance must be to provide for the development of a balanced, cohesive community which will make efficient use of the town's available land. (Cf. *Matter of Golden v Planning Bd. of Town of Ramapo,* 30 NY2d 359, 378, app dsmd 490 US 1003, *supra*.) * * *

"The first branch of the test, then, is simply whether the board has provided a properly balanced and well ordered plan for the community. (See *Udell v Haas,* 21 NY2d 463.) Of course, what may be appropriate for one community may differ substantially from what is appropriate for another. Thus, in this case, the court must ascertain what types of housing presently exist in New Castle, their quantity and quality, and whether this array adequately meets the present needs of the town. Also, it must be determined whether new construction is necessary to fulfill the future needs of New Castle residents, and if so, what forms the new developments ought to take.

"Secondly, in enacting a zoning ordinance, consideration must be given to regional needs and requirements * * * There must be a balancing of the local desire to maintain the *status quo* within the community and the greater public interest that regional needs be met * * *

"Thus, the court, in examining an ordinance, should take into consideration not only the general welfare of the residents of the zoning township, but should also consider the effect of the ordinance on the neighboring communities. While regional needs are a valid consideration in zoning, apart from any question as to the standing of persons outside the zoning jurisdiction to raise the issue, a town need not permit a use solely for the sake of the people of the region if regional needs are presently provided for in an adequate manner. Thus * * * [t]he second branch of the test is whether the town board, in excluding new multiple housing within its township, considered the needs of the region as well as the town for such housing. So long as the regional and local needs for such housing were supplied by

either the local community or by other accessible areas in the community at large, it cannot be said, as a matter of law, that such an ordinance had no substantial relation to the public health, safety, morals or general welfare."

Subsequently, the Court of Appeals refined this standard in *Kurzius, Inc. v Incorporated Vil. of Upper Brookville* (51 NY2d 338, 343-344, *cert denied* 450 US 1042), wherein it stated the following:

"In general, the enactment of a zoning ordinance is a valid exercise of the police power if its restrictions are not arbitrary and they bear a substantial relation to the health, welfare and safety of the community (*Euclid v Ambler Co.,* 272 US 365, 395). In New York, the Legislature has delegated zoning power to village boards pursuant to section 7-700 of the Village Law. Such delegation is not, of course, 'coterminous with stated police power objectives and has been considered less inclusive traditionally' (*Matter of Golden v Planning Bd. of Town of Ramapo,* 30 NY2d 359, 370, app dsmd 409 US 1003). Section 7-704 of the Village Law provides that these zoning regulations must be made in accordance with a comprehensive plan, and may be made only for certain enumerated purposes, including the promotion of health and the general welfare of the village. Thus, both the constitutional and statutory validity of a zoning ordinance depend 'on the facts of the particular case and whether it is "really designed to accomplish a legitimate public purpose"' (*Berenson v Town of New Castle,* 38 NY2d 102, 107, quoting *Matter of Wulfsohn v Burden,* 241 NY 288, 299).

"A zoning ordinance will be invalidated on both constitutional and State statutory grounds if it was enacted with an exclusionary purpose, or it ignores regional needs and has an unjustifiably exclusionary effect (*Matter of Golden v Planning Bd. of Town of Ramapo, supra; Berenson v Town of New Castle, supra*) * * *

"As legislative acts, zoning ordinances carry a presumption of constitutionality (*Town of Huntington v Park Shore Country Day Camp of Dix Hills,* 47 NY2d 61, 65; *Marcus Assoc. v Town of Huntington,* 45 NY2d 501, 505). We have stated on several occasions that this presumption is rebuttable, but that unconstitutionality must be demonstrated beyond a reasonable doubt (e.g., *Marcus Assoc. v Town of Huntington, supra*) * * * As Judge FULD stated in *Rodgers v Village of Tarrytown* (302 NY 115, 121): '[T]he power of a village to amend its basic zoning ordinance in such a way as reasonably to promote the general welfare cannot be questioned. Just as clearly, decision as to how

a community shall be zoned or rezoned, as to how various properties shall be classified or reclassified, rests with the local legislative body; its judgment and determination will be conclusive, beyond interference from the courts, unless shown to be arbitrary, and the burden of establishing such arbitrariness is imposed upon him who asserts it. In that connection, we recently said (*Shepard v. Village of Skaneateles,* 300 N.Y. 115, 118): "Upon parties who attack an ordinance * * * rests the burden of showing that the regulation assailed is not justified under the police power of the state by any reasonable interpretation of the facts. 'If the validity of the legislative classification for zoning purposes be fairly debatable, the legislative judgment must be allowed to control.' (*Village of Euclid v. Ambler Realty Co.,* 272 U.S. 365, 388; see, also, *Town of Islip v. Summers Coal & Lbr. Co.,* 257 N.Y. 167, 169, 170; *Matter of Wulfsohn v. Burden,* 241 N.Y. 288, 296-297.)"'".
Accordingly, our first task is to determine whether the plaintiffs have succeeded in proving their allegations under the foregoing standards of proof.

█ As has already been indicated, the first branch of the so-called *Berenson* test is whether the zoning ordinance in question "has provided a properly balanced and well ordered plan for the community" (*Berenson v Town of New Castle,* 38 NY2d 102, 110, *supra*). On its face, and paying particular attention to the plaintiffs' heavy burden of proof (*see, Kurzius, Inc. v Incorporated Vil. of Upper Brookville,* 51 NY2d 338, *supra*), we can only conclude that the present ordinance passes muster, as it clearly allows for a wide variety of different types and densities of residential housing. Thus, it provides, *inter alia,* for single-family homes on lots ranging in size from a high of two acres to a low of one third of an acre (omitting, for all intents and purposes, the "C" and "D" residential zones, for which it is agreed, there is virtually no acreage allotted), and, with the sole exception of the Manorville "A-2" area (where low density housing is mandated by environmental considerations), most of the remaining vacant residential acreage is in zones requiring minimum lot sizes of between one third and two thirds of an acre. It also allows for cluster developments as provided by Town Law § 281, and for four different types of multifamily developments, designated "MF-1", "MF-2", "PRC" and "PRC-3". The "MF-1" and "MF-2" zones are differentiated on the basis of their proximity to existing centers of development, with higher population densities being permitted in the "MF-2" zone based on its closer proximity to support facilities such as shopping and public transportation. "PRC" and "PRC-3" zones are designated for senior citizen

housing, the latter being constructed with, and the former being constructed without, governmental subsidies. In addition, the ordinance allows for the establishment of mobile home communities by special permit. Accordingly, it cannot be gainsaid that the ordinance, at least on its face, permits a wide variety of different types of housing, thus satisfying the "balance" component of the first branch of the *Berenson* test.

With regard to the second component of the first branch of the test, moreover, the plaintiffs have been unable to demonstrate that the ordinance in question fails to provide for a "well ordered plan" for the community (*see, Berenson v Town of New Castle, supra,* p 110), since neither their lay nor expert testimony was successful in overcoming either the strong presumption of constitutionality which attaches to such an ordinance or the testimony of the defendants' planning expert, Mr. Schulman. In the latter's opinion, the zoning ordinance, taken together with the provisions of the master plan and the statements of purpose which provide their underlying rationale, demonstrated a conscious, deliberate, rational and responsible approach to zoning and planning for the town's future development. As a preliminary matter, we, therefore, conclude that the ordinance, on its face, does indeed provide a "balanced and well ordered plan for the community" (*see, Berenson v Town of New Castle, supra,* p 110).

The foregoing is not, however, the end of our inquiry, since a significant proportion of the housing types permitted under the ordinance (in fact, all of the housing other than single-family homes) can only be built pursuant to a special permit. Accordingly, it becomes necessary for us to examine the actions of the town's authorities in order to determine whether those special permit provisions have actually been applied in a manner which allows for the construction of different types of housing, or merely represent "window dressing" for the benefit of the courts. On the record before us, the answer is clear, as the evidence revealed that there had been 49 developments of "cluster" housing which had been built pursuant to Town Law § 281; 36 permit approvals in the MF-1 and MF-2 zoning classifications; a number of PRC's; and three subsidized senior citizen developments (PRC-3's). These numbers are clearly sufficient to show that the special permit procedure has not been employed as a ruse to prevent the construction of multifamily housing in the Town of Brookhaven.

The second branch of the so-called *Berenson* test is whether the zoning ordinance under review has made adequate provision

for the satisfaction of the regional as well as the local housing needs, and, on this issue, we limit ourselves to the question of "whether, on its face, the * * * ordinance will allow [for] the construction of sufficient housing to meet the town's share of the region's housing needs, particularly for multifamily housing, *assuming that such construction be both physically and economically feasible*" (*Blitz v Town of New Castle*, 94 AD2d 92, 99). On numbers alone, plaintiffs cannot hope to prevail. The evidence adduced at trial showed that 70,000 additional single-family housing units could be built on the 49,100 acres of vacant residential land in the Town of Brookhaven, and this figure did not include an estimated 7,500 possible "in-fills" or units built on underutilized or nonconforming lots predating the promulgation of the present ordinance. Moreover, this did not include the possibility of additional rezoning for multifamily use, which would, in turn, allow for even higher densities and, therefore, additional units. Taking into account the number of housing units which the zoning ordinance makes possible and the number of people who could conceivably be housed therein, we must conclude that the ordinance, on its face, has given more than adequate consideration to the local and regional housing needs.

The heart of the instant complaint lies elsewhere, however, since the crux of the plaintiffs' contention appears to be that the ordinance is invalid because certain of its provisions, together with the town's regular practices in ruling upon special permit applications, have had the combined effect of preventing the construction of sufficient numbers of multifamily rental housing at affordable prices for the low-to-moderate-income families in the Town of Brookhaven and the surrounding region who need them, as well as preventing the construction of low-cost single-family housing and mobile home communities which might be affordable by moderate-income families. Before proceeding to consider whether plaintiffs have succeeded in proving some or all of these factual allegations, however, we must first examine the State of New York law on the issue of a municipality's obligation to zone for low-to-moderate-income housing.

Plaintiffs' bedrock legal contention is that *Berenson v Town of New Castle* (38 NY2d 102, *supra*) requires more of a zoning ordinance than the facial validity hereinabove discussed. They argue, in effect, that no matter how "well-balanced" or "well ordered" the plan provided by the ordinance may be, and regardless of how many housing units it theoretically permits to be built, it may and, indeed, must be considered invalid if its provisions do not, in fact, make possible the construction, at a profit to the developer, with or without governmental subsidies,

of a complete array of multifamily, single-family and mobile home housing affordable by low-to-moderate-income families in sufficient numbers to satisfy the reasonably foreseeable needs of this segment of the town's population, as well as so much of this segment of the region's population, as the town might reasonably be expected to house. Thus, plaintiffs contend, *inter alia,* that the *Berenson* ideal of a "balanced and well ordered" community includes not only an array of different types of housing construction (e.g., single-family homes on different size lots, "cluster" developments under Town Law § 281, and multifamily developments of varying densities), but also an array of such housing sufficient to meet the legitimate needs of all of the town's residents and others in the region *at prices they can afford.* We disagree.

A careful reading of the Court of Appeals decision in *Berenson v Town of New Castle (supra)* makes clear that the court therein was not attempting to address the types of questions sought to be raised by the plaintiffs at bar, since it approached the problem of exclusionary zoning solely in terms of traditional zoning and planning considerations, e.g., population density, infrastructure, rural/urban/suburban character, environmental amenities, etc., to the exclusion of the type of social and economic implications which the plaintiffs now urge upon us. Thus, *Berenson* does not address the question of how such housing is to be built; what it will cost to develop; whether governmental subsidies will be necessary and/or available; how much it will cost to sell and/or rent; and who, if anyone, will be able to afford the kinds of housing which are ultimately built, nor does it purport to mandate that a zoning ordinance make it possible for people of all classes to live in a given community. It merely requires that a town allow for the construction of different types of housing in sufficient numbers for those people who want and can afford it *(see, Blitz v Town of New Castle, 94 AD2d 92, 98-99, supra).* To the extent that plaintiffs wish us to go further, they are reading into the *Berenson* decision legal doctrines developed in the area of exclusionary zoning in some of our sister States, e.g., the State of New Jersey. However, these decisions go far beyond the law as declared by our own Court of Appeals, which has not, to this date, articulated any constitutional obligation on the part of our municipalities to zone for low-to-moderate-income housing *(cf. Southern Burlington County NAACP v Township of Mount Laurel,* 67 NJ 151, 336 A2d 713, *cert denied* 423 US 808; *Oakwood at Madison v Township of Madison,* 72 NJ 481, 371 A2d 1192; *Southern Burlington County NAACP v Township of Mount Laurel,* 92 NJ 158, 456 A2d 390). Accord-

ingly, present acceptance of the legal theories advanced by the plaintiffs would require us to work a change of historic proportions in the development of New York zoning law, a step which we respectfully decline to take.

Having thus disposed of plaintiffs' principal legal argument, we proceed to address their remaining factual contentions in the light of the *Berenson* standard. Plaintiffs' major factual contention on this appeal is that the failure to zone specific areas of the Town of Brookhaven for multifamily housing (and, parenthetically, for mobile home communities) has a "chilling" effect on developers' applications for special permits to rezone their land for such uses. They argue, *inter alia*, that the lengthy, multistage application process together with the low rate of approvals make investment in land for potential multifamily development a costly gamble; that it requires too much time and effort with too little chance of success; and that the failure to premap for multifamily housing allows developers rather than the town to decide the course of its future development.* Defendants' experts testified in support of the procedure, stating that it was the customary practice throughout Long Island, and that it is not the cause of any present lack of multifamily rental housing; rather, they claim rising construction costs, increased financing costs, and the added costs of maintenance and operation, plus economic stagnation, are the primary reasons for the failure of developers to undertake new multifamily developments in greater numbers.

■ It is clear from the evidence adduced at trial that perfection of an application for multifamily rezoning in the Town of Brookhaven is a long, cumbersome, expensive, and, to say the least, risky process. It is further clear that the rigidity of this process, together with the low and steadily declining rate of approvals, is, at least, a contributing cause of the declining rate of applications under the "MF" provisions of the Brookhaven zoning ordinance. We are unable to conclude, however, that the plaintiffs have succeeded in overcoming the presumption of this procedure's constitutionality beyond a reasonable doubt, especially where, as here, the town has proffered reasons in support thereof, which, if not compelling, are, at least, rational. Moreover, on the issue of causation, plaintiffs have failed to refute defendants' contention that economic conditions beyond the town's control are at least equally responsible for the present situation, and that, other factors remaining equal, the premap-

---

* We do not address that aspect of plaintiffs' argument addressed specifically to low-to-moderate-income housing for the reasons stated in our analysis of *Berenson v Town of New Castle* (38 NY2d 102).

ping of land within the town for multifamily usage would not significantly increase the supply of such housing. On this record, we therefore hold that the special permit application procedures for the establishment of multifamily housing and mobile home communities within the Town of Brookhaven are not unconstitutional.

■ We address the remainder of plaintiffs' factual contentions summarily. Plaintiffs attack the validity of the "MF" zoning provisions on the ground that they require additional area for units with extra bedrooms. However, defendants proffered a rational explanation for this rule, since more bedrooms mean more residents, and increased population requires increased area. Thus, plaintiffs have failed to show that this requirement is anything but proper. Defendants have also demonstrated a rational basis for their 50-acre minimum site area and large recreational area requirements in mobile home communities, and have overcome plaintiffs' further attack upon Brookhaven's failure to zone any significant amount of vacant land for any single-family residences on smaller than one third of an acre lots by pointing to the large amount of vacant residential acreage. An examination of the actual acreage of vacant residential land shows that there are large amounts of land available for single-family houses on lots of one third, one half and two thirds of an acre, which, by *Berenson* standards, shows a balanced choice of different cost and density single-family housing. Finally, we reject plaintiffs' challenge to the alleged practices of imposing covenants, e.g., limiting the number of two-bedroom units in multifamily developments to 20% of the total and requiring that all of the units in "cluster" developments be sold as condominiums rather than rented, in the context of the present challenge to the facial constitutionality of the Brookhaven ordinance under the *Berenson* standard.

Plaintiffs' second contention is that the Town of Brookhaven's zoning practices and policies have had the effect of excluding low-to-moderate-income housing from the town (specifically, multifamily rental housing subsidized by the United States Department of Housing and Urban Development), with a disproportionate impact on minorities, and of maintaining the town's racially segregated housing patterns by allowing the construction of such housing only in areas of existing minority concentration in violation of the Federal Fair Housing Act (42 USC § 3601 *et seq*.). Plaintiffs argue that defendants have failed to rebut this showing by demonstrating legitimate reasons for their actions. Defendants counter, first, that plaintiffs have failed to make out a prima facie case since the low-to-moderate-

income population of both the Town of Brookhaven and western Suffolk County, while containing a higher percentage of minorities than the general population, is still predominately white, and that the exclusions of subsidized housing thus affected proportionally more whites than it did minorities. In addition, they contend, *inter alia,* that even if the plaintiffs did make out a prima facie case, the town had legitimate reasons for resisting the projects in question and that the plaintiffs have failed to show their entitlement to any relief under the act.

■ The development of the case law under the Federal Fair Housing Act (42 USC § 3601 *et seq.*) is of relatively recent origin and dates roughly from the 1977 decision of the United States Supreme Court in *Arlington Hgts. v Metropolitan Hous. Corp.* (429 US 252), a case in which the plaintiffs had challenged a municipality's refusal to rezone property for subsidized housing as racially discriminatory. Until then, fair housing claims had generally been treated as derivative of equal protection arguments arising under the US Constitution, 14th Amendment, and allied Federal civil rights legislation (*see,* 42 USC § 1981 *et seq.*), but in that case, the Supreme Court held, *inter alia,* that plaintiffs alleging a denial of their right to equal protection in zoning decisions would have to prove a racially discriminatory intent or purpose (*Arlington Hgts. v Metropolitan Hous. Corp., supra,* pp 264-266). Finding a lack of such proof on the record before it, the Supreme Court rejected the plaintiffs' constitutional claim and remitted the matter to the Seventh Circuit Court of Appeals for a de novo consideration of their statutory claims under the Federal Fair Housing Act. On remittitur (*Metropolitan Hous. Dev. Corp. v Village of Arlington Hgts.,* 558 F2d 1283, 1290-1293, *cert denied* 434 US 1025), the Seventh Circuit held, *inter alia,* that a showing of intentional discrimination was not required under the statute and articulated the following, detailed standard of proof:

"We turn now to determining under what circumstances conduct that produces a discriminatory impact but which was taken without discriminatory intent will violate section 3604 (a). Four critical factors are * * * : (1) how strong is the plaintiff's showing of discriminatory effect; (2) is there some evidence of discriminatory intent, though not enough to satisfy the constitutional standard of *Washington v Davis* [426 US 229]; (3) what is the defendant's interest in taking the action complained of; and (4) does the plaintiff seek to compel the defendant to affirmatively provide housing for members of minority groups or merely to restrain the defendant from interfering with individual property

owners who wish to provide such housing. We shall examine each of these factors separately.

"1. There are two kinds of racially discriminatory effects which a facially neutral decision about housing can produce. The first occurs when that decision has a greater adverse impact on one racial group than on another. The second is the effect which the decision has on the community involved; if it perpetuates segregation and thereby prevents interracial association it will be considered invidious under the Fair Housing Act independently of the extent to which it produces a disparate effect on different racial groups. *See Trafficante,* 409 U.S. at 209-10, 93 S. Ct. 364 * * *

"The fact that the conduct complained of adversely affected white as well as nonwhite people, however, is not by itself an obstacle to relief under the Fair Housing Act. *See United States v. City of Black Jack,* 508 F2d 1179 (8th Cir. 1974), *cert. denied,* 422 U.S. 1042, 95 S. Ct. 2656, 45 L. Ed.2d 694 (1975); *Kennedy Park Homes Assoc., Inc. v. City of Lackawanna,* 436 F.2d 108 (2d Cir. 1970), *cert. denied,* 401 U.S. 1010, 91 S. Ct. 1256, 28 L. Ed.2d 546 (1971). In both of these cases, local zoning ordinances prevented the construction of low-income housing projects which would not have been limited to nonwhite people. Both courts nonetheless found a racially discriminatory effect * * *

"2. The second factor which appears to have been important in previous Fair Housing Act cases which focused on the discriminatory effect of the defendant's conduct was the presence of some evidence of discriminatory intent. In three cases this evidence was insufficient to independently support the relief which the plaintiff sought. *See Smith v. Anchor Bldg. Corp.,* 536 F.2d 231 (8th Cir. 1976); *Black Jack,* 508 F.2d at 1185 n. 3; *Resident Advisory Board v. Rizzo,* 425 F. Supp at 1021-25 (E.D. Pa. 1976). In another case the court found the defendant liable on both a discriminatory intent and a discriminatory impact theory. *See Kennedy Park,* 436 F.2d at 112-14, *aff'g,* 318 F. Supp. at 694-95.

"These courts did not address the role that evidence of intent ought to play in determining whether liability should be imposed because of discriminatory impact. But it is evident that the equitable argument for relief is stronger when there is some direct evidence that the defendant purposefully discriminated against members of minority groups because that evidence supports the inference that the defendant is a wrongdoer. Thus, the absence of any such evidence in this case is a factor buttressing the Village's contention that relief should be denied.

"We conclude, however, that this criterion is the least important of the four factors that we are examining. By hypothesis, we are dealing with a situation in which the evidence of intent constitutes an insufficient basis on which to ground relief. If we were to place great emphasis on partial evidence of purposeful discrimination we would be relying on an inference — that the defendant is a wrongdoer — which is at best conjectural. In addition, the problems associated with requiring conclusive proof of discriminatory intent which we earlier discussed remain troublesome in any attempt to weigh partial evidence of intent * * *

"3. The third factor which we find to be important is the interest of the defendant in taking the action which produces a discriminatory impact. If the defendant is a private individual or a group of private individuals seeking to protect private rights, the courts cannot be overly solicitous when the effect is to perpetuate segregated housing. *See Smith v Anchor Bldg. Corp.,* 536 F.2d 231 (8th Cir. 1976). Similarly, if the defendant is a governmental body acting outside the scope of its authority or abusing its power, it is not entitled to the deference which courts must pay to legitimate governmental action. *See Kennedy Park,* 436 F.2d at 113-14. *Cf. United Farmworkers of Florida Housing Project, Inc. v. City of Delray Beach,* 493 F.2d 799, 808-09 (5th Cir. 1974) (decided on equal protection grounds). On the other hand, if the defendant is a governmental body acting within the ambit of legitimately derived authority, we will less readily find that its action violates the Fair Housing Act. *See Joseph Skillken & Co. v. City of Toledo,* 528 F.2d 867, 876-77 (6th Cir. 1975), *vacated and remanded,* 429 U.S. 1068, 97 S. Ct. 800, 50 L. Ed.2 786 (1977) * * *

"4. The final criterion which will inform the exercise of our discretion is the nature of the relief which the plaintiff seeks. The courts ought to be more reluctant to grant relief when the plaintiff seeks to compel the defendant to construct integrated housing or take affirmative steps to ensure that integrated housing is built than when the plaintiff is attempting to build integrated housing on his own land and merely seeks to enjoin the defendant from interfering with that construction. To require a defendant to appropriate money, utilize his land for a particular purpose, or take other affirmative steps toward integrated housing is a massive judicial intrusion on private autonomy. By contrast, the courts are far more willing to prohibit even nonintentional action by the state which interferes with an individual's plan to use his own land to provide integrated housing. *See Shelley v. Kraemer,* 334 U.S. 1, 68 S. Ct. 836, 92 L.

Ed. 1161 (1948). The Second Circuit has explicitly relied on the distinction between requiring affirmative action on the part of the defendant and preventing the defendant from interfering with the plaintiff's attempt to build integrated housing in deciding whether to grant relief under the Fair Housing Act. *Compare Citizens Committee for Faraday Wood v. Lindsay,* 507 F.2d 1065, 1069 (2d Cir. 1974), *cert denied,* 421 U.S. 948, 95 S. Ct. 1679, 44 L. Ed.2d 102 (1975), and *Acevedo v. Nassau County,* 500 F.2d 1078, 1081 (2d Cir. 1974), with *Kennedy Park, supra. See also, Joseph Skillken & Co. v. City of Toledo,* 528 S. 2d at 878". A somewhat different standard was articulated several months later by the Third Circuit in *Resident Advisory Bd. v Rizzo* (564 F2d 126, *cert denied* 435 US 908), but we find the approach adopted in the *Arlington Heights* case to be preferable.

We therefore proceed, first, to examine the "effect" of the town's zoning practices on its residential patterns, and in this regard it is pertinent to note that in the *Arlington Heights* case, the Village of Arlington Heights was over 99% white, while the adjacent Chicago metropolitan area was 18% black (*Metropolitan Hous. Dev. Corp. v Village of Arlington Hgts.,* 558 F2d 1283, 1286-1287, *supra*). Accordingly, in that case, the effect of excluding subsidized housing from the Village of Arlington Heights was clearly to perpetuate all but total segregation with the village. Here, by way of contrast, plaintiffs do not allege that the Town of Brookhaven's zoning practices have operated to exclude minorities from the town, but rather that the practices have perpetuated intratown segregation by restricting subsidized family housing to the predominately "black" areas of the town, while excluding it from the predominately "white" areas. It should be noted, however, that while 61.2% of the town's black school population was, at the time in issue, located in the communities of Gordon Heights and North Bellport (which contained only 11% of the town's white population), there were also significant numbers of blacks in other areas of the town (e.g., the enrollment in the Bellport school district was 22.5% black, Center Moriches was 15.1% black, Middle Island was 14.1% black and South Haven was 5.8% black, as compared to a town-wide figure for blacks of approximately 3.6%). The over-all effect of the town's actions could therefore be seen as having had some racially disproportionate impact, but it was nowhere near as strong as it was in the *Arlington Heights* case.

The second factor to consider under the *Arlington Heights* test is the presence or absence of any evidence indicative of a racially discriminatory intent; but in this regard, while the record herein is replete with evidence that town officials, with popular

support, made every effort to exclude low-to-moderate-income housing, there is absolutely no direct evidence of any racial motivation on their part. In fact, the only evidence even remotely approaching such an intent consists of the remarks made by local residents at a hearing before the town's planning board on an application by one Harvey Auerbach to build subsidized housing in an area known as Ridge, but these remarks were never overtly racist nor are they binding, in any way, upon the town or its officials. Plaintiffs argue, nevertheless, that the town's withdrawal of its initial support of the project in the face of community opposition, the pretextual nature of the stated reasons for its rejection of the project, and the widespread use of "code words" such as "crime" in opposition to the project, all compel the conclusion that race was a significant factor in the town's decision. While plaintiffs' argument may have some facial appeal, the evidence adduced at trial simply does not warrant the conclusion that the town's decision was racially motivated.

The third factor of the so-called *Arlington Heights* test is defendants' interest in taking the action complained of. In this regard the Seventh Circuit specifically noted that a municipality, as here, exercising its zoning authority, is entitled to greater deference than a private individual or a governmental body acting outside of or in abuse of its lawful authority (*see, Metropolitan Hous. Dev. Corp. v Village of Arlington Hgts.*, 558 F2d, *supra*, p 1293).

The fourth and final factor to be considered is the nature of the relief sought by plaintiffs, with a prayer for affirmative action on the part of the town, e.g., to insure the construction of integrated housing, being less favorably regarded than one whose aim is to prevent interference. Here, while the plaintiffs are not requesting that the town be directed to build low-to-moderate-income housing, they are requesting in addition to rezoning and other related relief, that the town be ordered to commence an affirmative action program to assist developers in obtaining government subsidies. This clearly goes somewhat further than the rezoning of the one parcel requested in the *Arlington Heights* case.

Considering the above four factors, we are unable to conclude on the record, considered as a whole, that plaintiffs have successfully proven a violation of the Federal Fair Housing Act which would entitle them to the relief which they seek.

In conclusion, we therefore find, first, that the plaintiffs have failed to prove that the Town of Brookhaven's zoning

ordinance is unconstitutional, e.g., because it fails to facilitate the development of low-to-moderate-income housing (*see, Berenson v Town of New Castle,* 38 NY2d 102, *supra*); and, second, that they have likewise failed to prove a statutory violation of the Federal Fair Housing Act in the town's processing of applications to develop such housing. For the foregoing reasons, the judgment should be affirmed.

GIBBONS, J. P., THOMPSON, O'CONNOR and NIEHOFF, JJ., concur.

Judgment of the Supreme Court, Suffolk County, dated October 20, 1982, affirmed, without costs or disbursements.